**OSBORN LAW P.C.**
Daniel A. Osborn (CSB No. 132472)
295 Madison Avenue
New York, New York 10017
Telephone: (212) 725-9800
Facsimile: (212) 725-9808

[Additional attorneys on signature page]

*Attorneys for Lead Plaintiff William T. Hampton*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION – SANTA ANA

| | |
|---|---|
| WILLIAM T. HAMPTON, Individually and on Behalf of All Others Similarly Situated, | No.  8:15-CV-00131-CJC-JCG |
| | Hon. Cormac J. Carney |
| Plaintiff, | |
| v. | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, PIMCO FUNDS, E. PHILIP CANNON, J. MICHAEL HAGAN, BRENT R. HARRIS, DOUGLAS M. HODGE, RONALD C. PARKER, VERN O. CURTIS, WILLIAM J. POPEJOY, | |
| Defendants. | |

Lead Plaintiff William T. Hampton ("Lead Plaintiff"), on his own behalf and on behalf of others similarly situated, by his attorneys, hereby alleges the following based upon the investigation of Lead Plaintiff's counsel, which included among other things, a review of the facts and circumstances alleged herein,

including without limitation: (a) review and analysis of certain filings made by Defendants with the SEC; (b) review and analysis of certain press releases, public statements, news articles, and other publications disseminated by or concerning Defendants herein and related parties; (c) review and analysis of certain press conferences, analyst conference calls, and the website of PIMCO; (d) review and analysis of information concerning PIMCO and its funds, including the Fund, readily available on the Internet.

Lead Plaintiff believes that further substantial evidentiary support exists for the allegations in this First Amended Class Action Complaint and will be available after a reasonable opportunity for discovery. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.

## NATURE OF THE CLAIM

1.      This is a class action on behalf of all persons or entities who invested in defendant Pacific Investment Management Company, LLC's ("PIMCO" or the "Company") Total Return Fund between April 1, 2014 and September 12, 2014, inclusive (the "Class Period"), against PIMCO and certain related entities in connection with deviation from a stated Principal Investment Strategy of the Total Return Fund.

2.      PIMCO is an investment management company that was co-founded in 1971 in Newport Beach, California by Jim Muzzy, Bill Podlich, and Bill Gross ("Gross," who until recently served as the Company's Chief Investment Officer) as a unit of Pacific Mutual Life Insurance. In 2000, PIMCO was acquired by Allianz SE ("Allianz"), a diversified financial services provider headquartered in Munich, Germany. As of March 31, 2015, the Company employed 2,444 people in twelve countries and had $1.59 trillion in assets under management.

3.      PIMCO runs numerous exchange-traded, closed-end, and open-end funds. The Company's open-end funds, otherwise known as mutual funds, are sponsored by defendant PIMCO Funds, which was established as a Massachusetts business trust on February 19, 1987 and is registered under the Investment Company Act of 1940 as an open-end management investment company (the "Trust").

4.      At all times during the Class Period, the Trust consisted of over eighty separate portfolios. Defendant PIMCO serves as the investment advisor for the funds comprising the Trust. The Company's subsidiary, PIMCO Investments LLC ("PIMCO Investments" or the "Distributor"), is registered as a broker-dealer with the U.S. Securities and Exchange Commission ("SEC") and acts as a distributor for funds advised or sub-advised by PIMCO.

5.      One of the Company's most prominent offerings is its Total Return Fund (the "Fund"), an open-end fund (also known as a mutual fund) that is part of the Trust. At the time of the Fund's inception on May 11, 1987, it offered only institutional class shares. Since 2008, the Fund has offered eight separate classes of shares.  The Fund purports to offer a "maximum total return, consistent with preservation of capital and prudent investment management."

6.      In April 2013, the Fund had over $292 billion in assets under management ("AUM"). Indeed, the Fund was the largest bond fund in the world until May 4, 2015, when it was announced that the Vanguard Group's Total Bond Market Index fund ended April 2015 with $117.3 AUM, while the Fund, for reasons discussed in further detail below, closed with $110.4 billion AUM.

7.      During the Class Period, defendants PIMCO, the Trust, and the Trust's trustees (collectively, "Defendants") repeatedly assured investors that it limited its exposure to risky investments, such as investments in so-called

FIRST AMENDED CLASS ACTION COMPLAINT
8:15-CV-00131-CJC-JCG

emerging markets including Russia and Mexico.  As disclosed repeatedly in Forms 497 the Company filed with the SEC, PIMCO repeatedly disclosed that the Fund "may invest up to 15% of its total assets in securities and instruments that are economically tied to emerging market countries." This 15% cap was repeated in, among other things, PIMCO prospectuses. By way of example, on page 107 of the Form 485BPOS which the Company filed with the SEC on July 30, 2012 (the "July 2012 Prospectus"), PIMCO disclosed, under the header "Principal Investment Strategies," that "[t]he Fund may invest up to 15% of its total assets in securities and instruments that are economically tied to emerging market countries."

8.    Despite the Company's repeated representations, however, the Fund did not limit its investment in emerging markets to 15% of its assets. On the contrary, this threshold was eclipsed in 2014, reaching 21.1% as of June 30, 2014.

9.    On September 12, 2014, without any prior notice or shareholder approval, the Fund announced that, "Effective October 14, 2014, for the Funds listed below [including PIMCO Total Return Fund], percentage limitations on investments in securities and instruments that are economically tied to emerging market countries, as disclosed in the Principal Investment Strategies or elsewhere in the Prospectuses, do not apply to investment grade sovereign debt denominated in the local currency with less than 1 year remaining to maturity."

10.    On October 14, 2014, in a supplement to the Fund's April 30, 2014 Summary Prospectus (the "October Supplement"), the Fund changed its Principal Investment Strategies without any explanation.  Further, the October Supplement contained no disclosures concerning whether over 15% of the Fund's assets had previously been invested in emerging markets or whether the amended language had appeared in previous Fund documents.

11.    At no point did the Fund's investors vote to approve a deviation from the 15% cap on emerging market investments.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. sections 1332(d)(2) and 1367. Plaintiff is diverse from one or more of the defendants named herein, and the amount in controversy is greater than $5,000,000.

13.    This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

14.    Venue is proper in this Court pursuant to 28 U.S.C. section 1391(b) because PIMCO is headquartered in this District. Furthermore, at all times relevant to this action, many of the acts and transactions alleged herein occurred in substantial part in this District.

## THE PARTIES

15.    By Order of the Court dated May 7, 2015, William Hampton was appointed Lead Plaintiff. Lead Plaintiff purchased shares of the Fund during the Class Period as set forth in his certificate previously filed in this proceeding and sustained losses as a direct result of the wrongful conduct alleged herein. Hampton is a resident of the State of Oregon.

16.    Defendant PIMCO is a Delaware limited liability company with its principal place of business located at 650 Newport Center Drive, Newport Beach, CA 92660. Defendant PIMCO is an investment management firm that acted as investment advisor for the Fund at all times during the Class Period.  PIMCO is a resident of the State of California.

FIRST AMENDED CLASS ACTION COMPLAINT
8:15-CV-00131-CJC-JCG

17.    Defendant Fund is a mutual fund that, until recently, was the world's largest bond fund. The Fund is managed by the Trust and advised by PIMCO. PIMCO is a resident of the State of California.

18.    Defendant Trust is a business trust organized under the laws of the Commonwealth of Massachusetts, and at all times during the Class Period acted as trust for the Fund.

19.    Defendant E. Philip Cannon is, and at all relevant times was, a Trustee of the Trust.  Cannon is a citizen of the State of Texas.

20.    Defendant J. Michael Hagan is, and at all relevant times was, a Trustee of the Trust.  Hagan is a citizen of the State of California.

21.    Defendant Brent R. Harris is, and at all relevant times was, a Trustee of the Trust.  Harris is a citizen of the State of California.

22.    Defendant Douglas M. Hodge is, and at all relevant times was, a Trustee of the Trust.  Hodge is a citizen of the State of California.

23.    Defendant Ronald C. Parker is, and at all relevant times was, a Trustee of the Trust.  Parker is a citizen of the State of Oregon.

24.    Defendant Vern O. Curtis was a Trustee of the Trust at all relevant times until he resigned on or around June 30, 2014.  Curtis is a citizen of the State of Oregon.

25.    Defendant William J. Popejoy was a Trustee of the Trust at all relevant times until he resigned on or around July 31, 2014.  Popejoy is a citizen of the State of California.

26.    Defendants E. Philip Cannon, J. Michael Hagan, Brent R. Harris, Douglas M. Hodge, Ronald C. Parker, Vern O. Curtis, and William J. Popejoy are collectively referred to as "Trustees."

## SUBSTANTIVE ALLEGATIONS

*1987-2010: The Fund's Outstanding Performance*

27.     In 1987, PIMCO set up the Trust, a Massachusetts business trust registered under the Investment Company Act of 1940, to offer various open-end funds, including the Fund.

28.     Since the Fund's inception in 1987 until September 2014, its portfolio was managed by Gross, and through 2010 the Fund significantly outperformed its peers.

29.     Much of the Fund's success has been attributed to Gross' innovation and sage predictions. Beginning in 2005, Gross sent analysts around the country to pose as homebuyers and gather information on the realty market. Based on these analysts' reports of lax lending practices that required no down-payments or proof of income, the Fund stayed out of the subprime market, and reaped the benefits when the real estate bubble burst in late 2007.

30.     According to data compiled by Morningstar, Inc. ("Morningstar"), an investment research and management firm, the Fund was first in its peer category in 2007, returning over nine percent.

31.     After the onset of the so-called "great recession," Gross began advising the Department of Treasury on what actions it should take. Moreover, the Federal Reserve retained PIMCO, among others, to implement purchases of mortgage-backed securities guaranteed by federally sponsored agencies, including Fannie Mae and Freddie Mac. As part of its "shake hands with the government" plan, PIMCO also invested heavily in these mortgage-backed securities. Morningstar data indicates that, in March 2009, 91% of the Fund's assets were invested in such securities.

FIRST AMENDED CLASS ACTION COMPLAINT
8:15-CV-00131-CJC-JCG

32.     This policy produced enormous returns for the Fund. On September 7, 2008, then-Secretary of the Treasury Henry Paulson announced that the federal government would be placing Fannie Mae and Freddie Mac into conservatorship run by the Federal Housing Finance Agency, and would be infusing up to $100 billion in each government-sponsored enterprise. The Fund's value subsequently soared by $1.7 billion.

33.     According to Morningstar data, the Fund returned 4.82% in 2008, the height of the financial crisis. At the same time, the Fund's competitors were down an average of 4.69%. By September 2009, PIMCO's AUM had increased by $940 billion, or 32%, from the end of 2008. In 2008 and 2009, the Fund realized over $65 billion in net inflows.

34.     According to Bloomberg data, the Fund gained 8.1% per year in the five years through December 8, 2010, better than 98% of its peers.

35.     In January 2010, largely as a result of the foregoing, Gross' success at PIMCO led Morningstar to name him fixed income manager of the decade. He had previously won the fixed income manager of the year title in each of 1997, 2000, and 2007.

36.     On the strength of this performance, as well as Gross' reputation as "The Bond King," the Fund's AUM swelled from c. $38.2 billion at the start of 2001 to $250 billion in late 2010.

### *2011-Early 2014: Increased Pressure and Turmoil at PIMCO*

37.     The Fund's good fortune took a turn for the worse in 2011. At the time, Gross was harshly critical of the low rates being offered on U.S. Treasury bonds, going so far as to call them "robbery." Predicting a rise in rates, and consequent decline in bond prices, Gross moved the Fund's assets away from Treasury bonds, eliminating them entirely in February 2011. Gross also took short

FIRST AMENDED CLASS ACTION COMPLAINT
8:15-CV-00131-CJC-JCG

1  positions in U.S. interest rate swaps – *i.e.*, he placed bets against rates staying low.

2  Rates stayed low, however, and Treasury bonds actually gained in value. As a

3  result, in 2011 the Fund performed worse than 75% of its rivals, and 86% of core

4  funds tracked by Morningstar.

5       38.    Gross went so far as to apologize to his clients in an October 2011

6  letter titled "Mea Culpa," in which he declared the year to be "a stinker." He also

7  reassured clients, writing that "[t]here is no 'quit' in me or anyone else on the

8  Pimco premises. The early morning and even midnight hours have gone up, not

9  down, to match the increasing complexity of the global financial markets."

10       39.    On the strength of Gross' reputation and reassurances, the Fund

11  continued to see inflows of capital, reaching a peak AUM of $292.9 billion in

12  April 2013.

13       40.    In 2013, however, Gross made a series of missteps that Gross had a

14  deleterious impact on the Fund's performance:

15        •   The Fund purchased intermediate-term U.S. Treasury bonds,

16           including five-year bonds. This decision backfired when the price of

17           such Treasury bonds declined;

18        •   The Fund purchased Treasury Inflation-Protected Securities, which

19           rise in value when inflation, as measured by the Consumer Price

20           Index, increases. Inflation stayed low, however, and Treasury

21           Inflation-Protected Securities lost 6.8% between May 21 and Aug.

22           30, according to the Bank of America Merrill Lynch U.S. Inflation-

23           Linked Treasury Index; and

24        •   The Fund purchased Brazilian currency, which Gross asserted was a

25           superior investment to high-yield bonds. Brazilian currency fell 13%

26           relative to the U.S. dollar, however, and U.S. high yield bonds

27

28

9

1    climbed 7.4%, according to the Bank of America Merrill Lynch U.S.

2    High-Yield Index.

3        41.    The Fund realized outflows of investments every month from May

4    2013 through the end of the year.

5        42.    As reported in an exposé by the Wall Street Journal ("WSJ") titled

6    "Inside the Showdown Atop Pimco, the World's Biggest Bond Firm," the Fund's

7    faltering 2013 performance coincided with turmoil within PIMCO. The WSJ

8    reported that, in June 2013, Gross "squared off" with Mohamed El-Erian, then-

9    chief executive officer of PIMCO, over disagreements about Gross' conduct:

10
11       "I have a 41-year track record of investing excellence," Mr. Gross
         told Mr. El-Erian, according to the two witnesses. "What
         do *you* have?"

12
13       "I'm tired of cleaning up your s—," Mr. El-Erian responded, referring
         to conduct by Mr. Gross that he felt was hurting Pimco, these two
14       people recall.

15       43.    The WSJ further reported that "a high-pressure work environment

16   that turned less collegial over the past year, a deteriorating relationship between

17   the two senior executives and certain decisions by Mr. Gross that confused some

18   employees" were factors in Mr. El-Erian's departure. The exposé also noted that

19   Gross desired increased control over PIMCO in the face of declining performance:

20
21       Late last year, in front of a number of traders, Mr. Gross said, "if only
         Mohamed would let me, I could run all the $2 trillion myself…I'm
22       Secretariat," referring to the famed thoroughbred. "Why would you
         bet on anyone other than Secretariat?"

23
24       Pimco's performance added to strains. Mr. Gross's $237 billion
         Pimco Total Return fund lost 1.9% in 2013, the first year the fund
25       posted a negative return since 1999, although it narrowly beat the
         benchmark Barclays U.S. Aggregate Bond Index, which fell 2.02%.
26       Investors yanked a net $41.1 billion from Mr. Gross's fund—more
         withdrawals in a year, in dollar terms, than any fund in history,

27

28

10

FIRST AMENDED CLASS ACTION COMPLAINT
8:15-CV-00131-CJC-JCG

according to Morningstar, although it remained the world's largest bond fund.

44.     Following publication of the WSJ exposé, Reuters reported that had said, in a phone call, that he was "so sick of Mohamed trying to undermine" him. According to Reuters, Gross further claimed that he had "evidence" that Mr. El-Erian "wrote" the WSJ piece. When Reuters asked whether it could inspect this evidence, Gross reportedly replied: "You're on his side. Great, he's got you, too, wrapped around his charming right finger." Finally, Reuters reported that Gross indicated he had been monitoring Mr. El-Erian's phone calls.

45.     Eric Jacobson, a Morningstar senior analyst who has covered PIMCO for nearly two decades, told Reuters he had "never seen Bill and Pimco scrutinized like this before. This is the most attention I have seen on them. . . . A couple of high-profile stumbles and mediocre showings, coupled with some outflows - and with no identified successor for life after Bill - clearly has some investors on edge."

### *2014: The Emerging Markets Bet*

46.     With Mr. El-Erian gone and investors continuing to withdraw from the Fund, Gross was in a position and had the motivation to make aggressive moves to improve the Fund's performance.

47.     Accordingly, Gross and others at PIMCO began aggressively investing the Fund's assets in securities and instruments that are economically tied to emerging markets.

48.     The July 2012 Prospectus provided that:

The Fund invests primarily in investment-grade debt securities, but may invest up to 10% of its total assets in high yield securities ("junk bonds") rated B or higher by Moody's Investors Service, Inc. ("Moody's"), or equivalently rated by Standard & Poor's Ratings Services ("S&P") or Fitch, Inc. ("Fitch"), or, if unrated, determined

by Pacific Investment Management Company LLC ("PIMCO") to be of comparable quality (except that within such limitation, the Fund may invest in mortgage-related securities rated below B). The Fund may invest up to 30% of its total assets in securities denominated in foreign currencies, and may invest beyond this limit in U.S. dollar-denominated securities of foreign issuers. ***The Fund may invest up to 15% of its total assets in securities and instruments that are economically tied to emerging market countries.*** The Fund will normally limit its foreign currency exposure (from non-U.S. dollar-denominated securities or currencies) to 20% of its total assets.

[emphasis added]

49.    In a Form 485BPOS filed with the SEC on May 14, 2013, the Fund's Principal Investment Strategies were also described in this manner:

The Fund invests primarily in investment-grade debt securities, but may invest up to 10% of its total assets in high yield securities ("junk bonds") rated B or higher by Moody's Investors Service, Inc. ("Moody's"), or equivalently rated by Standard & Poor's Ratings Services ("S&P") or Fitch, Inc. ("Fitch"), or, if unrated, determined by Pacific Investment Management Company LLC ("PIMCO") to be of comparable quality (except that within such limitation, the Fund may invest in mortgage-related securities rated below B). The Fund may invest up to 30% of its total assets in securities denominated in foreign currencies, and may invest beyond this limit in U.S. dollar-denominated securities of foreign issuers. ***The Fund may invest up to 15% of its total assets in securities and instruments that are economically tied to emerging market countries.*** The Fund will normally limit its foreign currency exposure (from non-U.S. dollar-denominated securities or currencies) to 20% of its total assets.

[emphasis added]

50.    In early 2014, the Fund's "Principal Investment Strategies" limited investment "in securities and instruments that are economically tied to emerging market countries" to "up to 15% of [the Fund's] total assets," as described in the July 2012 Prospectus. Consistent with this strategy, the Fund's quarterly report for

12

the first quarter of 2014 disclosed that six percent of the market value of the Fund's assets were invested in emerging markets.

51.     Thereafter, Gross and others at PIMCO invested the Fund's assets in emerging markets in excess of the 15% threshold. According to the Fund's quarterly report for the second quarter of 2014, as of June 30, 2014, over 21% of the market value of the Fund's assets were invested in emerging markets, including 9.3% in Mexico, 6.4% in Brazil, and 1.4% in Russia.

52.     Similarly, the Fund's Quarterly Report for the third quarter of 2014 disclosed that as of September 30, 2014, almost 23% of the market value of the Fund's assets was invested in emerging markets, including 8.8% in Mexico, 7.9% in Brazil, and 1.5% in Russia.

53.     These investments performed poorly and negatively impacted the Fund. As described in a December 17, 2014 New York Times article entitled "A Wager on Emerging Markets That Seems Poorly Timed," in late 2014 "bonds and currencies in Brazil, Mexico, and Russia [] plunged." The article goes on to describe PIMCO's positions specifically:

> Pimco's outsize wager on emerging markets seems at the moment to be particularly ill timed. Many of its big positions are in local currency bonds and derivatives of oil-dependent economies like Mexico, Brazil and Russia. These securities have tumbled with falling oil prices and a strong dollar.

54.     Specifically, corporate bonds issued by each country's state-owned energy company—Brazil's Petrobras, Russia's Gazprom, and Mexico's Pemex—have performed poorly, as crude oil prices have slid precipitously since the Organization of Petroleum Exporting Countries determined in June 2014 that they would not cut production to stabilize prices.

55.     Beginning in early 2014, Brazilian authorities began looking into alleged corruption at Petrobras as part of an investigation named "Operation Car Wash."   On November 14, 2014, Brazilian Police carried out raids across six Brazilian states, arresting twenty-three people in connection with, *inter alia*, more than $3.9 billion dollars in assets being moved improperly.

56.     Petrobras' leading auditor, PricewaterhouseCoopers, has refused to sign off on its statements since the third quarter of 2014.

57.     On February 3, 2015, credit rating business Moody's lowered Petrobras' credit rating to junk status.

58.     On April 22, 2015, Petrobras announced that it lost $2.1 billion in the eight-year kickback scheme, as a result of the firm's executives taking bribes for awarding inflated contracts to suppliers.   At the same time, the Company announced more than $7 billion in overall losses for the financial year, which it attributed to corruption between 2004 and 2012, when 3% of each major contract was paid to politicians and executives.

59.     With respect to Gazprom, Russia's largest state energy concern, the company has been hit particularly hard by sanctions imposed by the U.S. and European Union over Russia's support of separatists and subsequent invasion of Ukraine in August 2014.

60.     On January 20, 2015, Moody's downgraded Gazprom from Baa2 to Baa3, one notch above junk bond status.  Russian national debt was downgraded to junk status by Standard & Poor's on January 26, 2015 and Moody's on February 20, 2015.  Moody's downgrade was paired with a "negative outlook" and driven by the following factors:

(1) The continuing crisis in Ukraine and the recent oil price and exchange rate shocks will further undermine Russia's economic

FIRST AMENDED CLASS ACTION COMPLAINT
8:15-CV-00131-CJC-JCG

strength and medium-term growth prospects, despite the fiscal and monetary policy responses;

(2) The government's financial strength will diminish materially as a result of fiscal pressures and the continued erosion of Russia's foreign exchange (FX) reserves in light of ongoing capital outflows and restricted access to international capital markets;

(3) The risk is rising, although still very low, that the international response to the military conflict in Ukraine triggers a decision by the Russian authorities that directly or indirectly undermines timely payments on external debt service.

61.    Falling oil prices and international tumult have also affected Mexico's Pemex, where, according to the New York Times, "the fear is that the oil price collapse will lead to a serious slowdown in Mexico."[1]  The New York Times also noted that the price of bonds in all three companies, which is inversely related to each bond's yield, had fallen as a result:

---

[1] Thomas Jr., Landon.  "Bond Investors Are Skittish Over Emerging Markets," New York Times (December 16, 2010).   Available online at: http://dealbook.nytimes.com/2014/12/16/bond-investors-are-skittish-over-emerging-markets/ (accessed July 6, 2015).

15

FIRST AMENDED CLASS ACTION COMPLAINT
8:15-CV-00131-CJC-JCG

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



The bond yields of all three companies, which move in the opposite direction of their underlying price, have spiked in recent days.

**Emerging Energy Problems**
Petrobras, Pemex and Gazprom have issued more bonds than any other corporations in emerging markets. Now their bonds are among the hardest hit, as investors seek to sell.

21    62.    The article goes on to note that "[t]he bonds and currencies in

22    countries that do not produce oil – like Turkey, India and South Africa – have also

23    suffered, a sign that investors have broader anxieties about emerging markets.

24    Such countries have been especially dependent on foreign capital flows to fund

25    their growth."

26    63.    Gross resigned from PIMCO in September 2014.

27

28

64.    As a result of the Fund's investments in emerging markets during the Class Period, which did not comport with the 15% cap set forth in various Fund prospectuses, the Fund—which, as the New York Times reported, held "big positions . . . in local currency bonds and derivatives of oil-dependent economies like Mexico, Brazil and Russia [that] have tumbled with falling oil prices and a strong dollar"—incurred substantial losses.

65.    On September 12, 2014, the Trust filed with the SEC a Supplement dated September 12, 2014 to the Bond Funds, Credit Bond Funds, Equity-Related Strategy Funds, Real Return Strategy Funds, Short Duration Strategy Funds, and Tax-Efficient Strategy Funds Prospectuses, each dated July 31, 2014, each as supplemented. This "Disclosure Regarding Investment Guidelines Pertaining to Investments in Securities and Instruments Economically Tied to Emerging Market Countries" stated that "[e]ffective October 14, 2014, for the [Total Return Fund], percentage limitations on investments in securities and instruments that are economically tied to emerging market countries, as disclosed in the Principal Investment Strategies or elsewhere in the Prospectuses, do not apply to investment grade sovereign debt denominated in the local currency with less than 1 year remaining to maturity."

66.    The October Supplement was the first prospectus to disclose to the Fund's investors that its investment in emerging markets may exceed 15% of the Fund's assets, revising previous language to provide that the 15% "limitation does not apply to investment grade sovereign debt denominated in the local currency with less than 1 year remaining to maturity[.]" According to the New York Times, Gross was responsible for the new wording.

FIRST AMENDED CLASS ACTION COMPLAINT
8:15-CV-00131-CJC-JCG

67.    This description of the Fund's Principal Investment Strategies was not modified during the Class Period. A Form 485BPOS filed with the SEC on July 25, 2014 also provided that:

> The Fund invests primarily in investment-grade debt securities, but may invest up to 10% of its total assets in high yield securities ("junk bonds") rated B or higher by Moody's Investors Service, Inc. ("Moody's"), or equivalently rated by Standard & Poor's Ratings Services ("S&P") or Fitch, Inc. ("Fitch"), or, if unrated, determined by Pacific Investment Management Company LLC ("PIMCO") to be of comparable quality (except that within such limitation, the Fund may invest in mortgage-related securities rated below B). The Fund may invest up to 30% of its total assets in securities denominated in foreign currencies, and may invest beyond this limit in U.S. dollar-denominated securities of foreign issuers. ***The Fund may invest up to 15% of its total assets in securities and instruments that are economically tied to emerging market countries.*** The Fund will normally limit its foreign currency exposure (from non-U.S. dollar-denominated securities or currencies) to 20% of its total assets.

[emphasis added]

68.    The statements in ¶¶ 48-51 unequivocally indicated that the Fund's exposure to risky emerging markets would be limited to 15% of Fund assets, per the Fund's Investment Objective to seek maximum total return "consistent with preservation of capital and ***prudent investment management***." (emphasis added.) During the Class Period, Defendants invested the Fund's assets in a manner inconsistent with the Fund's Principal Investment Strategies and Investment Objective that could, and did, harm investors by causing the Fund losses.

*The Fund Was Not Authorized to Invest Over 15% of its Assets in Emerging Market Securities*

69.    The Investment Companies Act provides that no registered investment company shall, unless authorized by the vote of a majority of its

outstanding voting securities, deviate from its policy in respect of concentration of investments in any particular industry or group of industries as recited in its registration statement.

70.     The Trust was established by a Declaration of Trust, dated February 19, 1987 and amended and restated as of December 15, 2010. Section 2.16 of the Declaration of Trust provides that the Trust's Trustees "may exercise each of the powers granted to them in [the] Declaration without the vote, approval or agreement of the Shareholders, *unless such a vote, approval or agreement is required by the 1940 Act* or applicable laws of the Commonwealth of Massachusetts" (emphasis added). Section 5.9 similarly vests in the shareholders the power to vote "with respect to such additional matters relating to the Trust as may be required by . . . any registration of the Trust as an investment company under the 1940 Act with the Commission (or any successor agency) or as the Trustees may consider necessary or desirable."

71.     During the Class Period, Defendants deviated from the statements made in its prospectuses concerning the percentage of fund assets which were being invested in "securities and instruments that are economically tied to emerging market countries." Nevertheless, holders of the Fund's voting securities did not approve, and indeed were never asked to approve, this deviation from the 15% emerging market cap. The Trust did not even file a corrected prospectus until October 14, 2014, well after risky investments with the Fund's assets in violation of the Fund's Principal Investment Strategies and Investment Objective caused investors significant losses.

72.     At all relevant times, the Trust's statements concerning investment of Fund assets in emerging markets particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages

sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of statements about the Fund's investment in emerging markets in, among other things, Fund prospectuses. These statements were, in essence, a contract between investors and Defendants, and the breach thereof caused the Fund's investors to realize the downside of the emerging market risk.

73.   Moreover, this deviation from the specific concentration of investments set forth in the prospectuses constituted a breach of the fiduciary duties which Defendants owed to their investors.

74.   Because Plaintiff does not allege a misrepresentation, omission, or manipulative or deceptive device, the claims for relief set forth herein are not preempted by the Securities Litigation Uniform Standards Act ("SLUSA"), codified at 15 U.S.C. sections 78bb *et seq*.

75.   Even were Plaintiff's claims of the kind which are preempted by SLUSA—which they are not—they would still fall within the so-called "Delaware carve-out." *See* 15 U.S.C. 78bb(f)(3). The Trust, as issuer of Fund equity securities, is a trust organized pursuant to laws of the Commonwealth of Massachusetts, under which Plaintiff's claims for relief arise. Consequently, said claims would still be properly maintained before this Court.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

76.   Lead Plaintiff brings this action as a class action pursuant to Rule 23 of Federal Rule of Civil Procedure on behalf of all persons who purchased or otherwise acquired shares of PIMCO Total Return Fund during the Class Period. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which

FIRST AMENDED CLASS ACTION COMPLAINT
8:15-CV-00131-CJC-JCG

1    Defendants have or had a controlling interest.

2          77.    The members of the Class are so numerous that joinder of all

3    members is impracticable. The disposition of their claims in a class action will

4    provide substantial benefits to the parties and the Court. At all relevant times,

5    billions of shares in the Fund were issued and outstanding.

6          78.    While the Class size is unknown to Lead Plaintiff at this time and can

7    only be ascertained through appropriate discovery, Lead Plaintiff believes that

8    there are hundreds or thousands of members in the proposed Class. Record owners

9    and other members of the Class may be identified from records maintained by

10   PIMCO and may be notified of the pendency of this action by mail, using the form

11   of notice similar to that customarily used in securities class actions.

12         79.    Lead Plaintiff's claims are typical of those of the Class because Lead

13   Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

14         80.    Lead Plaintiff will fairly and adequately protect the interests of the

15   Class and has retained counsel experienced in class and securities litigation. Lead

16   Plaintiff has no interests which conflict with those of the Class.

17         81.    Questions of law and fact common to the members of the Class

18   which predominate over any questions solely affecting individual members of the

19   Class include:

20         (a)    whether Defendants made specific representations about investments

21   in emerging markets in the Fund's prospectuses;

22         (b)    whether Defendants deviated from specific representations about

23   investments in emerging markets;

24         (c)    whether the Fund's investors voted to approve any deviation from

25   specific representations about investments in emerging markets made in the

26   Fund's prospectuses;

27

28
                                          21

(d)     the extent of damage sustained by Class members and the appropriate measure of damages.

82.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

## COUNT ONE
### Direct Claim for Breach of Contract against the Trust

83.     Lead Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

84.     This Count is asserted by Lead Plaintiffs on behalf of himself and the Class against defendants Trust and is based upon the law of the Commonwealth of Massachusetts.

85.     The Fund's various prospectuses, including terms appertaining to specific percentages of Fund assets which would be invested in securities and instruments that are economically tied to emerging market countries, formed the terms of a contract that was offered to Plaintiff and the Class by the Trust.

86.     Lead Plaintiff and the Class, by investing in the Fund, accepted this offer and all its material terms, including the Principal Investment Strategies which, among other things, limited the percentage of assets which would be invested in securities and instruments that are economically tied to emerging market countries to 15%.

87.     The Trust made this offer prior to, and at all times during, the Class Period.

88.     At no time did Lead Plaintiff, or any other member of the Class, vote to modify this contract by altering this material term.

89.     The Investment Company Act requires that any deviation from a "policy in respect of concentration of investments in any particular industry or

group of industries as recited in its registration statement" be approved by a vote of a majority of outstanding voting securities."

90.    Beginning at some unknown time during the Class Period, the Trust breached the contract by investing in excess of 15% of the Fund's assets in securities and instruments that are economically tied to emerging market countries.

91.    Lead Plaintiff and every other member of the Class sustained both monetary damages and an impairment of voting rights as a result of the breach.

## COUNT TWO
### Direct Claim for Breach of Trust against the Trustees

92.    Lead Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

93.    At all times relevant hereto, Lead Plaintiff and other Class members were investors in the Fund. As such, the Trustees owed them a fiduciary duty to invest the Fund's assets, which they held for Plaintiff and the Class who were the beneficial owners thereof, in accordance with the Fund's investment objectives, including the Principal Investment Strategies set forth in prospectuses relating to the Fund.

94.    The Trustees owed fiduciary duties to Lead Plaintiff and the Class. The Trustees were responsible for the oversight of PIMCO, the Fund's investment advisor, as well as ensuring that the Fund's assets were invested in accordance with the Fund's objectives, including its Principal Investment Strategies. The Trustees undertook to prudently invest the Fund's assets protect the rights and interests of the Fund's shareholders. As such, the Trustees owed the shareholders a duty to use reasonable care and to act in the best interests of the shareholders in investing the Fund's property, to deal fairly, honestly, and in good faith with Lead Plaintiff and the Class, and to avoid conflicts of interest, as well as a duty of

23

1    utmost loyalty.

2        95.    Article 10 of the Massachusetts Uniform Trust Code, Part II, Title II,

3    Chapter 203E, provides that "A violation by a trustee of a duty the trustee owes to

4    a beneficiary shall be a breach of trust."

5        96.    The Trustees caused the 15% cap on emerging market investments to

6    be exceeded negligently, with bad faith, willfully, with gross negligence, and/or

7    reckless disregard of their fiduciary duties.

8        97.    As a direct and proximate result of the breach of trust and/or

9    fiduciary duties complained of herein, Lead Plaintiff and the Class have sustained

10   damages.

11                              **<u>COUNT THREE</u>**

12   **Direct Claim for Breach of the Covenant of Good Faith and Fair Dealing
     against the Trustees**

13       98.    Lead Plaintiff incorporates by reference each and every preceding

14   paragraph as though fully set forth herein.

15       99.    By virtue of the Fund's prospectuses, as well as its duties under the

16   Investment Company Act of 1940, the Trust had a contractual obligation to adhere

17   to the prospectuses' terms, including the 15% cap set forth in the Principal

18   Investment Strategies.

19       100.   By virtue of this contract, the Trustees, in their capacity as trustees of

20   the Trust, were at all times bound by the covenant of good faith and fair dealing

21   implied by this contractual obligation.

22       101.   The Trustees violated the covenant of good faith and fair dealing by

23   investing more than 15% of the Fund's property in emerging markets without first

24   securing the approval of a majority of the Fund's shareholders.

25       102.   As a direct and proximate result of this violation, Lead Plaintiff and

26   the Class have sustained damages

27

28

## COUNT FOUR

### Direct Claim for Aiding and Abetting against PIMCO

103.   Lead Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

104.   Lead Plaintiff brings this cause of action for aiding and abetting the breaches of trust and/or fiduciary duties complained of in Count Two.

105.   The Trustees, by causing the Fund's assets to be invested in emerging markets in excess of the 15% cap, committed a breach of trust and/or fiduciary duties. PIMCO knew of this breach, yet nevertheless assisted, participated, encouraged, and otherwise enabled the breach.

106.   By assisting, participating in, encouraging, or otherwise enabling these breaches of trust and/or fiduciary duty, PIMCO is liable for aiding and abetting same.

107.   As a direct and proximate result of this aiding and abetting, Lead Plaintiff and the Class have sustained damages

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.   Declaring this action to be a proper class action pursuant to Fed. R Civ. R. 23;

B.   Awarding Lead Plaintiff and the members of the Class damages, including interest;

C.   Awarding Lead Plaintiff reasonable costs and attorneys' fees;

D.   Compelling the Trustees to perform their duties;

E.   Enjoining the Trustees from committing further breaches of trust;

F.   Compelling the Trustees to redress their breach;

G.   Ordering the Trustees to account;

H.    Suspending and/or removing the Trustees;

I.    Reducing or denying the compensation of the Trustees; and

J.    Awarding such equitable/injunctive or other relief in Lead Plaintiff's favor as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

Lead Plaintiff demands a trial by jury.

Dated: July 6, 2015

/s/ Daniel Osborn
Daniel A. Osborn (CSB No. 132472)
OSBORN LAW P.C.
295 Madison Avenue
New York, New York 10017
Telephone: (212) 725-9800
Facsimile: (212) 725-9808

*Attorneys for Plaintiff William T. Hampton*

Nicholas I. Porritt
Adam M. Apton
LEVI & KORSINSKY LLP
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 337-1567

-and-

Christopher J. Kupka
LEVI & KORSINSKY LLP
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

*Lead Counsel for Plaintiff William T. Hampton
and Lead Counsel for Class*

4836-6713-1429, v. 2

FIRST AMENDED CLASS ACTION COMPLAINT
8:15-CV-00131-CJC-JCG