DECHERT LLP
Matthew L. Larrabee, Esq. (SBN 97147)
matthew.larrabee@dechert.com
Joshua D. N. Hess, Esq. (SBN 244115)
joshua.hess@dechert.com
633 West 5th Street, 37th Floor
Los Angeles, CA 90071
Telephone: (213) 808-5700
Facsimile: (213) 808-5760

David A. Kotler, Esq. (*Admitted Pro Hac Vice*)
david.kotler@dechert.com
Suite 500
902 Carnegie Center
Princeton, NJ 08540
Telephone: (609) 955-3226
Facsimile: (609) 955-3259

Attorneys for Defendants PIMCO Funds, E.
Philip Cannon, J. Michael Hagan, Ronald C.
Parker, and Vern O. Curtis

[Additional Parties and Counsel on Signature
Page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION – SANTA ANA

| | |
|---|---|
| WILLIAM T. HAMPTON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, PIMCO FUNDS, E. PHILIP CANNON, J. MICHAEL HAGAN, BRENT R. HARRIS, DOUGLAS M. HODGE, RONALD C. PARKER, VERN O. CURTIS, WILLIAM J. POPEJOY,<br><br>Defendants. | No.  8:15-CV-00131-CJC-JCG<br><br>Hon. Cormac J. Carney<br><br>**(1) DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS**<br>**(Fed. R. Civ. P. 12(b)(6))**<br><br>**(2) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date:   November 2, 2015<br>Time:            1:30 p.m.<br>Location:        Courtroom 9B<br>Judge:           Hon. Cormac J. Carney |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on November 2nd, 2015, at 1:30 p.m., or as soon thereafter as the matter may be heard, before the Honorable Cormac J. Carney in Courtroom 9B, United States District Court, Central District of California, located at 411 West Fourth Street, Room 1053 Santa Ana, California 92701, Defendants Pacific Investment Management Company LLC, PIMCO Funds, E. Philip Cannon, J. Michael Hagan, Brent R. Harris, Douglas M. Hodge, Ronald C. Parker, Vern O. Curtis, and William J. Popejoy ("Defendants") will and hereby do move this Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the First Amended Complaint with prejudice on the grounds that the claims alleged therein fail to state a claim upon which relief can be granted.  This motion is based on the Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, Declaration of Joshua D.N. Hess, Request for Judicial Notice, the Court's file herein, and such evidence and argument as may be presented at the hearing of the Motion.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which was completed on September 28, 2015.

Dated:        October 5, 2015         Respectfully Submitted,

DECHERT LLP

By: _/s/    Matthew L. Larrabee_____
Matthew L. Larrabee
Joshua D. N. Hess
633 West 5th Street, 37th Floor
Los Angeles, CA 90071

David A. Kotler (*pro hac vice*)
Suite 500
902 Carnegie Center
Princeton, NJ 08540-6531

*Attorneys for Defendants PIMCO Funds,*
*E. Philip Cannon, J. Michael Hagan,*
*Ronald C. Parker, and Vern O. Curtis*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICE OF FRANK D. RORIE JR.
Frank D. Rorie Jr.
8335 Sunset Boulevard, Suite 303
West Hollywood, CA 90069

ROPES & GRAY LLP
John D. Donovan, Esq. (*pro hac vice*)
Robert A. Skinner, Esq. (*pro hac vice*)
Amy D. Roy, Esq. (*pro hac vice*)
Prudential Tower, 800 Boylston Street
Boston, MA 02199

John C. Ertman, Esq. (*pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036

*Attorneys for Defendant Pacific
Investment Management Company LLC,
Brent R. Harris, and Douglas M. Hodge*

BROWN RUDNICK LLP
Ronald Rus, Esq.
Randall A. Smith, Esq.
Leo J. Presiado, Esq.
2211 Michelson Drive, 7th Floor
Irvine, CA 92612

*Attorneys for Defendant William J. Popejoy*

NOTICE OF MOTION AND MOTION TO
DISMISS, CASE NO.  8:15-CV-00131-CJC-JCG

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

I.   The Fund's Emerging-Market "Principal Investment Strategy" Is Not An "Investment Policy" Under the ICA And Therefore Can Be Changed Unilaterally By The Fund ................................................. 3

II.  The Fund Discloses A Change To Its Investment Strategy.................. 5

III. Plaintiff Misinterprets The Fund's Quarterly Investment Reports ....... 6

PROCEDURAL HISTORY.................................................................................... 7

LEGAL ARGUMENT........................................................................................... 9

I.   EACH OF PLAINTIFF'S CLAIMS IS PRECLUDED BY SLUSA ......................................................................................... 9

     A.   SLUSA Precludes Plaintiff's State-Law Causes Of Action ....... 9

     B.   The FAC Asserts A Classic Securities Fraud Claim Dressed As State-Law Breach Of Fiduciary Duty And Breach Of Contract Claims In Direct Contravention Of SLUSA ................................................................................. 10

     C.   The "Delaware Carve-Out" Does Not Shield Plaintiff's Claims From SLUSA Preclusion ............................................ 13

II.  PLAINTIFF FAILS TO PLEAD THE EXISTENCE OR BREACH OF ANY CONTRACT OR COVENANT....................... 15

     A.   A "Principal Investment Strategy" In The Fund's Prospectus Does Not Create A Contract Between The Fund And Its Shareholders................................................................ 15

     B.   Plaintiff Fails To Plead Any Contractual Breach.................... 17

III. PLAINTIFF FAILS TO PLEAD THE BREACH OF ANY FIDUCIARY DUTY.......................................................................... 18

IV.  THE NINTH CIRCUIT'S *NORTHSTAR* DECISION IS INAPPICABLE TO PLAINTIFF'S CLAIMS................................... 21

V.   EACH OF PLAINTIFF'S CLAIMS FAILS BECAUSE THE CLAIMS MUST BE ASSERTED DERIVATIVELY...................... 23

VI.  PLAINTIFF FAILS TO PLEAD A CLAIM FOR AIDING AND ABETTING ...................................................................................... 25

CONCLUSION ................................................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECHERT LLP
ATTORNEYS AT LAW
LOS ANGELES

- i -

NOTICE OF MOTION AND MOTION TO DISMISS, CASE NO.  8:15-CV-00131-CJC-JCG

# TABLE OF AUTHORITIES

Page

**CASES**

*Arcidi v. National Association of Government Employees, Inc.*,
856 N.E.2d 167 (Mass. 2006) ........................................................................25

*Blake v. Smith*,
22 Mass. L. Rptr. 173 (Mass. Super. Ct. 2006) ..............................................20

*Cholla Ready Mix, Inc. v. Civish*,
382 F.3d 969 (9th Cir. 2004)..........................................................................13

*Cohen v. Stratosphere Corp.*,
115 F.3d 695 (9th Cir. 1997)....................................................................16, 21

*Crimi v. Barnholt*,
No. C 08-02249 CRB, 2008 WL 4287566 (N.D. Cal. Sept. 17, 2008) .............15

*Douglas v. United States District Court*,
495 F.3d 1062 (9th Cir. 2007)..................................................................16, 17

*Felton v. Morgan Stanley Dean Witter & Co.*,
429 F. Supp. 2d 684 (S.D.N.Y. 2006) ..............................................................12

*Fidelity Bank National Ass'n v. Aldrich*,
No. Civ.A. 3-95-CV-2566H, 1998 WL 120296 (N.D. Tex. Mar. 5, 1998) .......16

*Forsythe v. Sun Life Financial, Inc.*,
417 F. Supp. 2d 100 (D. Mass. 2006)..............................................................24

*Freeman Investments, L.P. v. Pacific Life Insurance Co.*,
704 F.3d 1110 (9th Cir. 2013).........................................................................12

*Halebian v. Berv*,
931 N.E.2d 986 (Mass. 2010) .........................................................................23

*Hewitt v. Mobile Research Techology, Inc.*,
285 F. App'x 694 (11th Cir. 2008)..................................................................16

*Huang v. Reyes*,
No. C 07-5950 CRB, 2008 WL 648519 (N.D. Cal. Mar. 6, 2008)....................14

DECHERT LLP
ATTORNEYS AT LAW
LOS ANGELES

- ii -

*In re Atlantic Financial Mangement Securities Ligigation*,
    121 F.R.D. 141 (D. Mass. 1988) ........................................................................19

*In re Charles Schwab Corp. Sec. Litig.*,
    No. C 08-01510 WHA, 2009 WL 1371409 (N.D. Cal. May 15, 2009)..............20

*In Re Columbia Entities Litig.*,
    Civil Action No. 04-11704-REK, 2005 WL 6776751 (D. Mass. Nov. 30,
    2005) ................................................................................................................24

*In re Omnicom Group Inc., Securities Litigation*,
    233 F.R.D. 400 (S.D.N.Y. 2006).........................................................................19

*In re Silicon Graphics, Inc. Securities Litigation*,
    970 F. Supp. 746 (N.D. Cal. 1997).......................................................................4

*Lacey v. Maricopa County*,
    693 F.3d 896 (9th Cir. 2012)........................................................................18, 19

*Lapidus v. Hecht*,
    232 F.3d 679 (9th Cir. 2000).............................................................................24

*Madden v. Cowen & Co.*,
    576 F.3d 957 (9th Cir. 2009).................................................................9, 10, 14

*McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*,
    339 F.3d 1087 (9th Cir. 2003)....................................................... 16, 21, 22, 23

*Miller v. Nationwide Life Insurance Co.*,
    391 F.3d 698 (5th Cir. 2004)...............................................................................13

*Mutchka v. Harris*,
    373 F. Supp. 2d 1021 (C.D. Cal. 2005)..............................................................24

*Northstar Financial Advisors, Inc. v. Schwab Investments*,
    No. 8-CV-04119-LHK (N.D. Cal. Oct. 5, 2015) ...............................................21

*Northstar Financial Advisors, Inc. v. Schwab Investments*,
    615 F.3d 1106 (9th Cir. 2010).............................................................................20

*Northstar Financial Advisors, Inc. v. Schwab Investments*,
    781 F. Supp. 2d 926 (N.D. Cal. 2011)................................................................13

DECHERT LLP
ATTORNEYS AT LAW
LOS ANGELES

- iii -

NOTICE OF MOTION AND MOTION TO
DISMISS, CASE NO.  8:15-CV-00131-CJC-JCG

*Northstar Financial Advisors, Inc. v. Schwab Investments*,
    779 F.3d 1036 (9th Cir. 2015) ................................................................... passim

*O'Brien v. Pearson*,
    868 N.E.2d 118 (Mass. 2007) ..........................................................................20

*Romano v. Kazacos*,
    609 F.3d 512 (2d Cir. 2010) .............................................................................12

*Smit v. Charles Scwhab & Co.*,
    No. 10-CV-03971-LHK, 2011 WL 846697 (N.D. Cal. Mar. 8, 2011) ........ 12, 13

*Spinner v. Nutt*, 631 N.E.2d 542 (Mass. 1995) .......................................................25

*StoodyBroser v. Bank of America*,
    No. C 08–02705 JSW, 2009 WL 2707393 (N.D. Cal. Aug. 25, 2009) .............13

*United States v. Ritchie*,
    342 F. 3d 903 (9th Cir. 2003) .............................................................................4

**STATUTES**

15 U.S.C. § 77p ....................................................................................... 10, 11, 13

15 U.S.C. § 77r(b)(2) .............................................................................................10

15 U.S.C. § 80a-13(a) ................................................................................ 3, 4, 20, 21

15 U.S.C. § 80a-8 ....................................................................................................3

15 U.S.C. § 80a-35(b) ..............................................................................................2

Massachusetts General Laws ch. 156D § 7.42 ......................................................23

**OTHER AUTHORITIES**

17 C.F.R. § 230.486 (May 24, 1982) ............................................................... 16, 17

17 C.F.R. § 274.11A (Aug. 22, 1983) ....................................................................4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### **INTRODUCTION**

In January 2015, Plaintiff filed his initial class action complaint in this matter alleging a single claim for securities fraud pursuant to Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated by the Securities and Exchange Commission ("SEC").  Plaintiff and his counsel subsequently moved for certification as lead plaintiff and lead counsel, respectively, under the Private Securities Litigation Reform Act ("PSLRA").  Following the Court's approval of those applications, on July 7, 2015, Plaintiff dramatically re-characterized his claims with the First Amended Complaint ("FAC") (ECF No. 21), jettisoning his securities fraud claim and instead purporting to bring common-law breach of contract and fiduciary duty claims on a class-wide basis.[1]  This re-characterization, however, does not alter the gravamen of his claim:  the PIMCO Total Return Fund (the "Fund") purportedly misrepresented the extent to which it was investing in certain "risky" investments.  Consequently, the claims asserted in the FAC are precluded under the Securities Litigation Uniform Standards Act ("SLUSA"), which explicitly bars state-law class actions pursuing misrepresentation claims involving covered securities such as the Fund's shares.

The FAC suffers from additional fundamental defects that independently warrant its dismissal.  Foremost, Plaintiff cannot plausibly allege that the Fund's prospectus created a contract between the Fund and its shareholders.  To the contrary, the prospectus limitation upon which Plaintiff rests all of the claims in the FAC is not a "fundamental" investment policy of the Fund and, pursuant to federal law, could be modified or eliminated entirely by the Fund at any time—thereby rendering the prospectus as anything but a contract, and the claimed misconduct as

---

[1] Although Plaintiff did not offer a reason for this dramatic restyling of his complaint, it is worth remembering that, according to Plaintiff himself, he only allegedly suffered a loss of $75 under his original claim.  *See* Pl.'s Supplemental Information, ECF No. 14 at 3.

anything but a breach.  Additionally, the fiduciary breach claim against the Fund's trustees fails because the FAC:  (1) lacks any allegation of wrongdoing, much less the willful misconduct required to hold the trustees liable on that theory; (2) is nothing more than an improper attempt to bring an unauthorized cause of action under Section 13(a) of the Investment Company Act of 1940 ("ICA"); and (3) alleges the claim on behalf of a putative class of *purchasers* (not holders) of the Fund's shares, to whom no fiduciary duty can possibly be owed.  Because no fiduciary breach claim has been adequately pleaded, the aiding and abetting claim against PIMCO must also be dismissed.  Any attempt by Plaintiff to squeeze his claims under *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 779 F.3d 1036 (9th Cir. 2015) ("*Northstar*") is in vain.  Unlike the voluntary and non-fundamental policy upon which the FAC is premised, *Northstar* found a contract existed between a mutual fund and its shareholders only where the shareholders approved "fundamental investment objectives," which could not be changed without shareholder approval under federal law.  *Id.* at 1051.  Finally, all of the Plaintiff's claims must be dismissed because they are derivative claims that belong to the Fund under Massachusetts law, and Plaintiff has failed to make a demand on the Fund's Board of Trustees, as is universally required under Massachusetts law.

## BACKGROUND

PIMCO Funds is a Massachusetts business trust that is an open-end management investment company registered under the ICA, 15 U.S.C. § 80a-35(b), containing numerous publicly-offered separate series or "funds," including the Fund, the only fund at issue in the FAC.  FAC ¶¶ 1-4, 16-18.  The Fund's investment objective is to "seek[] maximum total return, consistent with preservation of capital and prudent investment management."  PIMCO Funds, Post-Effective Amendment No. 258 to the Registration Statement, dated July 25, 2014, attached as Exhibit A to the Declaration of Joshua D.N. Hess ("Hess Decl.") at 6 ("July 25, 2014 Prospectus").  Pacific Investment Management Company LLC

("PIMCO") serves as investment advisor to the Fund. Messrs. Cannon, Hagan, Harris, Hodge, Parker, Curtis, and Popejoy[2] were the Fund's trustees during the relevant period.

## I. The Fund's Emerging-Market "Principal Investment Strategy" Is Not An "Investment Policy" Under the ICA And Therefore Can Be Changed Unilaterally By The Fund

The ICA requires mutual funds to register with the SEC. 15 U.S.C. § 80a-8. Under Section 8 of the ICA, a mutual fund's registration statement (which includes the fund's prospectus) must contain "a recital of all investment policies of the registrant . . . which are changeable only if authorized by shareholder vote," *id.* § 80a-8(b)(2), and "a recital of all policies of the registrant . . . which the registrant deems matters of fundamental policy." *Id.* § 80a-8(b)(3). Section 13 of the ICA, in turn, prohibits mutual funds from "deviat[ing] from any investment policy which is changeable only if authorized by shareholder vote" and "deviat[ing] from any [fundamental] policy recited in its registration statement," *id.* § 80a-13(a)(3), "unless authorized by a . . . majority of its outstanding voting securities." *Id.* § 80a-13(a). Accordingly, but for one exception not relevant here,[3] a mutual fund may voluntarily and unilaterally change any policies or strategies that are not deemed "fundamental" or otherwise recited as changeable only upon shareholder vote.

At issue in the FAC is a one-sentence disclosure in the Fund's prospectus under the heading "Principal Investment Strategies": the Fund "may invest up to 15% of its total assets in securities and instruments that are economically tied to emerging market countries" (the "15% Cap" or "Cap"). July 25, 2014 Prospectus at

---

[2] Although Plaintiff alleges in the FAC that Mr. Popejoy served as a Trustee until July 31, 2014 (FAC ¶ 25), in fact Mr. Popejoy ceased being a trustee of the Fund on May 14, 2014, one month into the Class Period.

[3] A mutual fund cannot deviate from "its policy in respect of concentration of investments in any particular industry or group of industries as recited in the registration statement" without shareholder approval. 15 U.S.C. § 80a-13(a)(3).

7;[4] *see* PIMCO Funds, Supplement to the Bond Funds Class D Prospectus dated July 31, 2007 (Form 497) (Nov. 13, 2007), attached as Hess Decl. Ex. B at 35 (supplement announcing change to institute 15% Cap).  The Cap is included in the prospectus to provide investors with one metric to assess the Fund's risk associated with its emerging market holdings.

Importantly, shareholder approval is not required to amend the Cap because the prospectus does not provide that the Cap is "changeable only if authorized by shareholder vote," nor does it list the Cap among the Fund's "fundamental" policies.  *See* 15 U.S.C. § 80a-13(a)(3).  As required under the ICA, the Fund's Statement of Additional Information (SAI),[5] which is incorporated as part of the prospectus, includes an exhaustive list of "Fundamental Investment Restrictions" that "may not be changed with respect to a Fund without shareholder approval," and neither the 15% Cap specifically, nor any percentage limitation guideline for emerging market investments, is listed among those restrictions.  *See* July 25, 2014 Prospectus at 26-27.  Indeed, the Fund's prospectus makes clear that unless "investment policies of the Funds" are fundamental or "otherwise stated, [they] may be changed by the Board of Trustees without shareholder approval."  *See id.* at 18.

Nothing in the prospectus "otherwise state[s]" that the Trustees' ability to

---

[4] As set forth more fully in the Hess Decl. and Request for Judicial Notice, the prospectuses, quarterly investor reports, and other documents cited in this brief are all either materials that have been expressly incorporated into the FAC, publicly filed with the SEC or Secretary of the Commonwealth of Massachusetts, or both. Accordingly, the Court may consider these materials in ruling on this motion to dismiss.  *See, e.g.*, *United States v. Ritchie*, 342 F. 3d 903, 908 (9th Cir. 2003); *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 758 (N.D. Cal. 1997).

[5] Mutual funds are required to file SAIs, which provide investors with additional information concerning the fund beyond that contained in the prospectus.  *See, e.g.*, 17 C.F.R. §§ 274.11A (Aug. 22, 1983); 230.134b (Dec. 1, 1992); SEC Form N-1A, 18-42 (May 2015), attached as Hess Decl. Ex. F.

amend the 15% Cap is qualified.  Hence, the Cap—like other Principal Investment Strategies—was approved voluntarily and unilaterally by the Fund, and could be removed or modified voluntarily and unilaterally by the Fund.  *See* PIMCO Funds, Amended and Restated Decl. of Trust (Dec. 15, 2010), attached as Hess Decl. Ex. I at 167 (hereinafter "Decl. of Trust") (providing that the Fund Trustees have "exclusive and absolute control over the Trust Property and over the business of the Trust").

## II.    The Fund Discloses A Change To Its Investment Strategy

On September 12, 2014, PIMCO Funds filed a supplement (the "September 12 Supplement") to certain prospectuses and SAIs notifying investors of a then-forthcoming adjustment impacting nearly 40 funds within the PIMCO Funds trust, including the Fund.  Although not required by the ICA to provide any advance notice for a non-fundamental change, the September 12 Supplement advised that any percentage limitation guidelines for investments tied to emerging market countries would, "[e]ffective October 14, 2014, . . . not apply to investment grade sovereign debt denominated in the local currency with less than 1 year remaining to maturity."  PIMCO Funds, Supplement to Certain Fund Prospectuses, each dated July 31, 2014 (Sept. 12, 2014), attached as Hess Decl. Ex. C at 42.  This change did not affect the Fund's investment objective or any fundamental investment policies.  Furthermore, the Fund's investments in securities denominated in foreign currencies remained subject to a separate, non-fundamental prospectus limit.  *Compare* July 25, 2014 Prospectus at 7 ("The Fund may invest up to 30% of its total assets in securities denominated in foreign currencies . . . ."), *with* PIMCO Funds, PIMCO Total Return Fund Summary Prospectus (Form 497K) (Oct. 14, 2014), attached as Hess Decl. Ex. D at 45 (same).  In accordance with the September 12 Supplement, PIMCO Funds' October 14, 2014 supplement to its July 31, 2014 SAI disclosed that the 15% Cap "do[es] not apply to investment grade sovereign debt denominated in the local currency with less than 1 year remaining to

maturity."  PIMCO Funds, Statement of Additional Information (Form 497) (Oct. 14, 2014), attached as Hess Decl. Ex. E at 59.

### III.    Plaintiff Misinterprets The Fund's Quarterly Investment Reports

To provide investors with additional insight into the Fund's risk profile, the Fund publishes other metrics for shareholders to evaluate its exposure to emerging markets.  Pertinent here, for the first three quarters of 2014, the Fund's Quarterly Investment Reports ("QIR") included information regarding the Fund's exposure to emerging markets as a percentage of the Fund's then-current market value.  Relying exclusively on the Fund's June 30, 2014, and September 30, 2014 QIRs ("Q2" and "Q3", respectively), Plaintiff alleges that the Fund exceeded the 15% Cap.  FAC ¶¶ 51, 52.  But the 15% Cap, as explained in the prospectuses, is based on <u>total</u> assets, whereas the concentrations reported in the QIRs are based on <u>net</u> assets. *Compare* July 25, 2014 Prospectus at 7 (setting forth the emerging market exposure limitation as "15% of [the Fund's] total assets"), *with* PIMCO Funds, PIMCO Total Return Fund Quarterly Investment Report (Sept. 30, 2014), attached as Hess Decl. Ex. H at 158 (hereinafter "Q3 QIR") (explaining its "[m]arket value data [is] based on percentage of net assets of the mutual fund," and a "net asset" exposure metric "differs from compliance calculations based on total assets of the mutual fund[s]").[6]

Further differentiating the QIR figures, the exposure level for each QIR is reported as of the last day of the relevant quarter, whereas the 15% Cap is measured "at the time of investment."  July 25, 2014 Prospectus at 18.  This distinction is significant because the prospectus provides that "[a] Fund would not violate these limitations [*i.e.*, the 15% Cap] unless an excess or deficiency occurs or exists

---

[6] Because the Fund, like most bond funds, has certain liabilities, its net assets are less than its total assets.  To illustrate, the March 31, 2015 Annual Report indicates the Fund's Total Assets are $167,643,241,000 and its Net Assets are $116,848,749,000, approximately $51 billion less.  PIMCO Funds, Certified Shareholder Report of Registered Management Investment Companies (Form N-CSR) (May 29, 2015), attached as Hess Decl. Ex. J at 187.

1   *immediately after and as a result of an investment*." *Id.* (emphasis added).  In other

2   words, the Fund may exceed the Cap—and is under no obligation to reduce its

3   emerging market holdings—as a result of common passive investment activities,

4   such as market movements and the payout of cash due to shareholder redemptions.

5   *See id.* at 29 ("Any subsequent change . . . in the percentage of Fund assets invested

6   in certain securities or other instruments . . . resulting from market fluctuations or

7   other changes in a Fund's total assets will not require a Fund to dispose of an

8   investment.").  Accordingly, the simple observation that the Fund's emerging

9   market exposure exceeded 15% of its net assets at any particular time does not

10  imply that the Fund made an affirmative investment that caused exposure to exceed

11  15% of its total assets.  *See* PIMCO Funds, PIMCO Total Return Fund Quarterly

12  Investment Report (June 30, 2014), attached as Hess Decl. Ex. G at 135 (explaining

13  that "[a]ll mutual funds are separately monitored for compliance with prospectus

14  . . . requirements").

15       Ignoring these foundational flaws, Plaintiff recklessly alleges that the Q2 and

16  Q3 QIRs disclose emerging market exposure levels in excess of 15% of the Fund's

17  total assets, and therefore "PIMCO invested the Fund's assets . . . in excess of the

18  15% threshold" set forth in its prospectus.  FAC ¶¶ 51-52.  The FAC does not

19  contain any allegation suggesting that the Fund's emerging market exposure

20  exceeded 15% of the value of the Fund's total assets "immediately after and as a

21  result of" a new investment decision.  *See id.* ¶ 90 ("Beginning at some unknown

22  time during the Class Period, the Trust . . . invest[ed] in excess of 15% . . . .").  As

23  such, Plaintiff's claims are predicated on a misleading, apples-to-oranges

24  comparison from which one cannot plausibly infer the Fund actually exceeded the

25  15% Cap.

### PROCEDURAL HISTORY

27       Plaintiff originally pled a single class action claim for violation of Section

28  10(b) of the Exchange Act and Rule 10b-5, alleging that PIMCO, PIMCO

Investments LLC and PIMCO Total Return Fund—but not the PIMCO Funds trust or the Individual Trustee Defendants—represented, in numerous disclosures offering the Fund for sale to investors, that that they would invest in "risky derivatives" under a certain threshold when in fact they "invested in them at will without regard to these restrictions."  Class Action Complaint ("CAC") ¶ 21, ECF No. 1.  The CAC asserted that Defendants thereby "mislead [sic] the investors in the PIMCO Total Return Fund" and "Defendants' misrepresentations have resulted in losses and/or limited gains on their investments."  *Id.* ¶¶ 21, 22.  The Court granted Plaintiff's uncontested motion for appointment as lead plaintiff pursuant to the PSLRA, recognizing that Plaintiff was alleging a federal securities claim under the theory that "Defendants' misrepresentations have resulted in losses for investors."  Order at 3, ECF No. 17.  The Court expressly held that Plaintiff's "interests aligned with those of other class members because *each member of the class purchased PIMCO securities in reliance on its allegedly misleading statements*."  *Id.* at 4 (emphasis added).[7]

After securing lead plaintiff status under the PSLRA, Plaintiff recast his complaint to drop the single federal securities fraud claim and re-plead the same theory under four purported state-law causes of actions (Massachusetts law)—breach of contract, breach of covenant of good faith and fair dealing, breach of trust/fiduciary duty and aiding and abetting the same.  Plaintiff also removed PIMCO Investments and the PIMCO Total Return Fund as defendants and added the Trustee Defendants.  However, the core factual predicate of this case—the Fund allegedly invested beyond its self-imposed restrictions—remains essentially unchanged from the CAC.  *Compare* CAC ¶ 21 ("Defendants have mislead [sic] investors . . . by telling them . . . that these types of investments are restricted, when

---

[7] The Court also granted the application of Plaintiff's counsel to serve as lead counsel pursuant to the PSLRA.  Order at 4.

in fact they have invested in them at will without regard to these restrictions."), *with* FAC ¶ 8 ("Despite the Company's repeated representations, however, the Fund did not limit its investment in emerging markets to 15% of its assets."); *id.* ¶¶ 72 & 81. The FAC also continues to assert claims only on behalf of a putative class of purchasers of the Fund's shares. *Id.* ¶ 76. In a blatant effort to avoid preclusion under SLUSA, the Plaintiff has simply scrubbed and removed his previously chosen characterization in the CAC of the "prospectuses and other documents" as containing "misrepresentations." CAC ¶¶ 21, 22.[8]

## LEGAL ARGUMENT

## I.   EACH OF PLAINTIFF'S CLAIMS IS PRECLUDED BY SLUSA

### A.   SLUSA Precludes Plaintiff's State-Law Causes Of Action

The PSLRA established a comprehensive regime governing all putative class actions involving misrepresentations or omissions in connection with the sale of securities in order "to deter or at least quickly dispose of abusive class actions . . . by limiting the potential liability of defendants and by requiring plaintiffs who bring private securities fraud actions in federal court to surmount a number of procedural hurdles." *Madden v. Cowen & Co.*, 576 F.3d 957, 964 (9th Cir. 2009). This regime change had the "unintended consequence" of prompting activist shareholders to find creative ways to restyle their securities fraud claims under the guise of state laws, without changing the substance of the claims, in order to avoid "the obstacles set in their path by the [PSLRA]." *Id.* In response, as the Ninth Circuit has squarely acknowledged, "Congress enacted SLUSA to . . . prevent

---

[8] The FAC also dramatically narrows the class period by 32 months. *Compare* Ex. B to Osborn Declaration In Support Of Motion To Appoint Lead Plaintiff ("Osborn Dec.") [ECF No. 7-4] (class period of January 16, 2012, through September 11, 2014), *with* FAC ¶ 1 (class period of April 1, 2014, through September 12, 2014). Plaintiff's own submission concedes that the share value *increased* from April 1, 2014 ($10.78) through September 2, 2014 ($10.99). Ex. A to Osborn Dec. (ECF No. 7-3).

certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the [PSLRA]." *Id.*

An "action will fall within SLUSA's preclusion provision if the action is (1) a 'covered class action' (2) 'based upon the statutory or common law' of any state (3) being maintained by 'any private party,' and if the action alleges (4) either 'an untrue statement or omission of material fact' or 'that the defendant used or employed any manipulative or deceptive device or contrivance' (5) 'in connection with the purchase or sale' (6) of a 'covered security.'" *Id.* at 965 (quoting 15 U.S.C. § 77p(b)).  Plaintiff asserts state-law claims on behalf of a putative class of more than 50 people, FAC ¶ 78, and there can be no dispute that shares of the Fund qualify as "covered securities" within the meaning of SLUSA.  15 U.S.C. § 77r(b)(2) ("A security is a covered security if such security is a security issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940 . . . .").

### B. The FAC Asserts A Classic Securities Fraud Claim Dressed As State-Law Breach Of Fiduciary Duty And Breach Of Contract Claims In Direct Contravention Of SLUSA

After first filing this case as a federal securities fraud action, Plaintiff now engages in the precise gamesmanship that SLUSA was enacted to prevent by repackaging his securities fraud claims as state-law breach of fiduciary duty and breach of contract claims.  The gravamen of Plaintiff's claim is that the shareholder class was allegedly harmed because it relied on the Fund's allegedly "untrue statement[s] or omission[s] of material fact in connection with the purchase or sale of a covered security" (15 U.S.C. § 77p(b)(1))—here, the Fund's allegedly false representations regarding how the Fund's assets would be invested.  Specifically, Plaintiff alleges that "[t]he statements in [the prospectuses] unequivocally indicated that the Fund's exposure to risky emerging markets would be limited to 15% of [the] Fund's assets" when, according to Plaintiff, "Defendants invested the Fund's assets in a manner inconsistent with" these statements.  FAC ¶ 68.  Also according

to Plaintiff, the Fund exceeded this limit by June 30, 2014.  *Id.* ¶ 8 ("*Despite the Company's repeated representations* . . . the Fund did not limit its investment in emerging markets to 15% of its assets.  On the contrary, this threshold was eclipsed in 2014, reaching 21.1% as of June 30, 2014." (emphasis added)).  Plaintiff further pleads that the Fund intentionally concealed this purported fact for at least an additional three and a half months.  *Id.* ¶ 71 ("The Trust did not even file a corrected prospectus until October 14, 2014, well after risky investments with the Fund's assets in violation of the Fund's Principal Investment Strategies and Investment Objectives caused investors significant losses."); *id.* ¶ 9 ("[T]he October Supplement contained no disclosures concerning whether over 15% of the Fund's assets had previously been invested in emerging markets or whether the amended language had appeared in previous Fund documents.").

Plaintiff's own summary of the central legal issues further demonstrates that this is a classic misrepresentation case.  According to Plaintiff, the "questions of law and fact common to the members of the Class" include "whether Defendants made specific representations about investments in emerging markets in the Fund's prospectuses" and "whether Defendants deviated from specific representations about investments in emerging markets"—but not whether any Defendants had a contract with the shareholders, breached a contract with the shareholders, or breached a fiduciary duty to the shareholders.  *See id.* ¶ 81.  Additionally, the report jointly submitted by the parties pursuant to Federal Rule of Civil Procedure 26(f) further confirms Plaintiff's recognition that his allegations are based on purportedly inadequate or misleading disclosures.  *See* Corrected Joint Report Pursuant To Fed. R. Civ. P. 2(9f) [ECF No. 39 at 2] ("Defendants caused the Fund to invest more than [15%] of the Fund's assets in emerging markets *while disclosing* that the Fund 'may invest up to 15% of its total assets in securities and instruments that are economically tied to emerging market countries.'" (emphasis added)).

Although Plaintiff now seeks to restyle his claims as breach of fiduciary duty

1    and contract claims, the <u>substance</u> of these claims demonstrates that this case

2    remains, as it was when originally filed, a traditional securities fraud case.  *See*

3    *Freeman Invs., L.P. v. Pac. Life Ins. Co.*, 704 F.3d 1110, 115 (9th Cir. 2013)

4    (courts must "look to the substance of the allegations" and "plaintiffs cannot avoid

5    preclusion through artful pleading that removes the covered words . . . but leaves in

6    the covered concepts" ) (internal quotation omitted)[9]; *Smit v. Charles Scwhab &*

7    *Co.*, No. 10-CV-03971-LHK, 2011 WL 846697, at *5 (N.D. Cal. Mar. 8, 2011)

8    ("Plaintiff cannot avoid SLUSA by artful drafting to avoid the term

9    'misrepresentation.'"); *Romano v. Kazacos*, 609 F.3d 512, 523 (2d Cir. 2010).  A

10   claim will not survive SLUSA when it is merely "a securities fraud wolf dressed up

11   in a breach of contract sheep's clothing."  *Felton v. Morgan Stanley Dean Witter &*

12   *Co.*, 429 F. Supp. 2d 684, 693 (S.D.N.Y. 2006).  Indeed, Plaintiff has already

13   successfully obtained certification as Lead Plaintiff for a PSLRA case and expressly

14   touts that status in the FAC.  *See* FAC ¶ 15.

15         There can be no dispute that Plaintiff seeks to recover damages that he and

16   other investors allegedly suffered because of their reliance upon the Fund's

17   purported misrepresentations and omissions.  Indeed, Plaintiff takes the position

18   that it was the Fund's misrepresentations, rather than the actual investments, that

19   caused the alleged harm in this case.  *Id.* ¶ 72 ("[T]he Trust's *statements* concerning

20   investment of Fund assets in emerging markets particularized in this complaint

21   directly or proximately caused, or were a substantial contributing cause of, the

22   damages sustained by Lead Plaintiff and other members of the Class.") (emphasis

23   added).  Nevertheless, Plaintiff seeks to avoid the unavoidable by means of a

24   boilerplate disclaimer that "the claims for relief set forth herein are not preempted

25   by [SLUSA]."  *Id.* ¶ 74.  Such legal conclusions are not entitled to any deference in

26

27   ─────────────

28   [9] SLUSA did not preclude the breach of contract claim in *Freeman* because, unlike
     here, the case was about contract *interpretation*.  704 F.3d at 1115.

ruling on a motion to dismiss.  *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004).  Further, and more importantly, this assertion cannot be squared with the numerous allegations in the FAC that are expressly premised upon an alleged misrepresentation concerning a purported limitation on the Fund's investment activity.[10]

## C.   The "Delaware Carve-Out" Does Not Shield Plaintiff's Claims From SLUSA Preclusion

Implicitly conceding his transparent attempt to circumvent the procedural hurdles of the PSLRA and SLUSA, Plaintiff alternatively pleads that his claims are saved from SLUSA preclusion by the so-called "Delaware carve-out" because "[t]he Trust . . . is . . . organized pursuant to the laws of the Commonwealth of Massachusetts, under which Plaintiff's claims for relief arise."  FAC ¶ 75.  This legal conclusion is not entitled to deference at the pleadings stage, especially so because it is an incorrect statement of the law.

The "Delaware carve-out," as set forth in 15 U.S.C. § 77p(d), applies only to certain "permissible actions" that would otherwise be precluded by SLUSA when the Plaintiff asserts class action claims under "the statutory or common law of the State in which the issuer is incorporated . . . or organized."  15 U.S.C. § 77p(d)(1)(A).  Even if a claim is asserted under the law of the issuer's State of incorporation, however, only two narrow categories of cases meet the statutory definition of "permissible actions."  15 U.S.C. § 77p(d)(1)(B).  The first type of "permissible action" involves "the purchase or sale of securities by the issuer or an

---

[10] Courts routinely recognize that SLUSA precludes state-law claims alleging that mutual funds were managed in a manner contrary to their prospectus disclosures. *See, e.g., StoodyBroser v. Bank of America*, No. C 08–02705 JSW, 2009 WL 2707393, at *2 (N.D. Cal. Aug. 25, 2009); *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 781 F. Supp. 2d 926, 935 (N.D. Cal. 2011), *rev'd on other grounds*, 779 F.3d 1036 (9th Cir. 2015); *Smit*, 2011 WL 846697, at *5; *Miller v. Nationwide Life Ins. Co.*, 391 F.3d 698, 701-02 (5th Cir. 2004).

1    affiliate of the issuer exclusively from or to holders of equity" and is plainly

2    inapplicable because the purchase of Fund shares was open to all members of the

3    investing public.

4         The second type of "permissible action" applies only where the claim meets

5    all of the following elements:  (1) a "recommendation, position, or other

6    communication with respect to the sale of securities," (2) "made by or on behalf of

7    the issuer or its affiliate to the shareholders of the issuer," and (3) "concerning

8    [shareholder] decisions . . . with respect to voting their securities, acting in response

9    to a tender or exchange offer, or exercising dissenters' or appraisal rights."

10   *Madden*, 576 F.3d at 964 (internal citations omitted).  The FAC does not contain

11   any factual allegations that suggest this case qualifies as this type of "permissible

12   action" under the Delaware carve-out.  This case does not involve a "tender or

13   exchange offer" and it does not involve the exercise of dissenters' or appraisal

14   rights.  It also does not involve any "decision . . . with respect to voting . . .

15   securities."  *Id.*  Although Plaintiff does incorrectly allege that a vote should have

16   occurred, the absence of a vote does not implicate the Delaware carve-out.  Under

17   any reading of the FAC, the misrepresentations alleged in this case do not

18   "concern[ ] decisions" regarding a vote because it is undisputed that the putative

19   class members were not asked to vote in the first place on either the adoption,

20   modification, or removal of the policy.  No "decision" was made "with respect to

21   voting . . . securities."  *See, e.g.*, *Huang v. Reyes*, No. C 07-5950 CRB, 2008 WL

22   648519, at *5 (N.D. Cal. Mar. 6, 2008) ("[T]he carve-out . . . appl[ies] where . . .

23   the corporation issues proxy statements requesting that the shareholders vote

24   . . . .").  The purported misrepresentations described in the FAC have nothing to do

25   with influencing (or in any other way implicating) any particular shareholder vote.

26   Instead, the purported misrepresentations are only alleged to have misled

27   shareholders in deciding whether to purchase and hold their shares—decisions that

28   are entirely unrelated to how the shareholders may vote their shares.

1    *Crimi v. Barnholt*, No. C 08-02249 CRB, 2008 WL 4287566 (N.D. Cal. Sept.

2    17, 2008), is instructive.  In *Crimi*, shareholders of KLA brought breach of

3    fiduciary duty claims based on KLA's alleged failure to disclose that it had issued

4    backdated stock options to its senior executives.  The Court divided the claims into

5    two categories: "holder" claims and "voting" claims.  The "holder" claims were

6    based on allegations that the purported failure to disclose had prevented the

7    shareholders from "mak[ing] an informed decision concerning whether they should

8    continue holding their shares," whereas the "voting" claims arose from allegations

9    that the non-disclosure had deprived shareholders "of their ability to make an

10   informed decision" regarding certain stock issuances and an executive

11   compensation plan that were the subject of a shareholder vote.  *Id.* at *3.  The court

12   held that the "holder" claims were precluded by SLUSA, but the "voting" claims

13   were saved by the Delaware carve-out.  Here, Plaintiff's claims closely resemble

14   the "holder" claims in *Crimi* because Plaintiff alleges that class members purchased

15   or held shares in reliance on misrepresentations and omissions regarding the 15%

16   Cap.  FAC ¶¶ 8, 9, 68-71.  Unlike the "voting" claims in *Crimi*, where a vote was

17   actually held and information was concealed from shareholders to influence the

18   outcome, here Plaintiff acknowledges that no vote occurred and, accordingly, must

19   concede that no vote was improperly influenced by any alleged misrepresentations

20   or omissions.  *See, e.g.*, *id.* ¶ 71 (conceding that Fund shareholders were "never

21   asked to approve" the alleged "deviation").  Accordingly, this case is not a

22   "permissible action" within the meaning of the Delaware carve-out.

## II.    PLAINTIFF FAILS TO PLEAD THE EXISTENCE OR BREACH OF ANY CONTRACT OR COVENANT

### A.    A "Principal Investment Strategy" In The Fund's Prospectus Does Not Create A Contract Between The Fund And Its Shareholders

26   Plaintiff also does not identify any actual contract upon which his breach of

27   contract and breach of implied covenant claims are based but, instead, pleads that

28   "[t]he Fund's various prospectuses . . . formed the terms of a contract that was

offered to Plaintiff and the Class by the Trust," which they allegedly accepted simply "by investing in the Fund." FAC ¶¶ 85-86. This theory ignores conclusive Ninth Circuit precedent that prospectuses generally do not constitute contractual offers that may be accepted to form binding contracts. *See McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*, 339 F.3d 1087 (9th Cir. 2003) ("*McKesson*"); *Cohen v. Stratosphere Corp.*, 115 F.3d 695, 701 (9th Cir. 1997) (prospectus, plus payment, "did not create enforceable contracts" with investors). As explained in *McKesson*, although prospectuses may sometimes be referred to as "offers," "the term 'offer' has a different and far broader meaning in securities law than in contract law." 339 F.3d at 1092. The Ninth Circuit recognized in *Cohen* that "the mutual assent and intent to be bound that are required for the formation of a contract" are "absent" when an investor merely purchases shares after reading a prospectus and provides no further evidence of contract formation. *Cohen*, 115 F. 3d at 701.[11]

The Ninth Circuit's recognition that shareholders do not enter into contracts merely by purchasing shares pursuant to prospectuses is grounded in core principles of contract law. Contracts are considered firm and binding agreements and, in furtherance of that goal, "a party can't unilaterally change the terms of a contract." *Douglas v. United States District Court*, 495 F.3d 1062, 1066 (9th Cir. 2007). But mutual funds not only are permitted to alter the terms of their prospectuses unilaterally, they are <u>required</u> by federal law to update them every year. *See* 17 C.F.R. §§ 230.486 (May 24, 1982), 230.497 (Aug. 22, 1983). When performing these mandatory revisions, or at any time in between the yearly updates, nearly

---

[11] *See also Hewitt v. Mobile Research Tech., Inc.*, 285 F. App'x 694, 696 (11th Cir. 2008) ("The 8-K form filed with the Commission is neither a contract nor an assignment."); *Fidelity Bank Nat'l Ass'n v. Aldrich*, No. Civ.A. 3-95-CV-2566H, 1998 WL 120296, at *2 (N.D. Tex. Mar. 5, 1998) (dismissing contract claim based on "Merger Agreement, Proxy Statement, and the National Banking Act" because they did "not show[ ] the existence of a contract").

1    every aspect of a prospectus may be changed or withdrawn.  *Id.*  The mutable

2    nature of fund prospectuses is wholly inconsistent with the firm and unchanging

3    nature of contracts.  When it is understood that material terms within the prospectus

4    can be changed at any time and for any reason, it cannot reasonably be inferred that

5    either the Fund or the shareholder had any expectation of being contractually bound

6    by any terms contained within.  *Douglas*, 495 F.3d at 1066.

7    **B.    Plaintiff Fails To Plead Any Contractual Breach**

8         Even if the shareholders possessed a contractual right to enforce the 15% Cap

9    stated in the prospectuses—and they do not—Plaintiff has failed to plead any

10   violation of that Cap because Plaintiff does not plead that the Fund invested more

11   than "15% of its *total* assets in securities and instruments that are economically tied

12   to emerging market countries."  July 25, 2014 Prospectus at 7 (emphasis added).

13   Further, Plaintiff must plead that the Fund exceeded 15% "immediately after and as

14   a result of" an affirmative investment because the prospectus expressly states that

15   the "Fund would not violate [this] limitation[ ] unless an excess or deficiency

16   occurs or exists *immediately after and as a result of an investment*."  *Id.* at 15

17   (emphasis added).  This qualification makes clear there would be no "violation" of

18   the 15% Cap if the Fund were, for example, to invest <u>less</u> than 15% of its total

19   assets in emerging markets and then, as a result of wholly-passive market activity,

20   that number drifted above 15% at a later time.  The FAC is devoid of any allegation

21   that the Fund ever made an affirmative investment that raised the Fund's

22   concentration in emerging markets above 15% of its total assets at the time of

23   investment and, accordingly, Plaintiff has not pleaded a breach of contract or

24   breach of covenant claim.

25        The only basis alleged in the FAC for Plaintiff's belief that the Fund

26   exceeded the 15% Cap is that the June 30, 2014 QIR reported that 21% of the

27   market value of the Fund's assets was invested in emerging markets and the

28   September 30, 2014 QIR reported 23%.  FAC ¶¶ 51-52.  As set forth above, the

QIRs are intended to provide shareholders with a metric separate from the Fund's prospectus disclosure to evaluate the Fund's risk profile, use a different methodology to calculate emerging markets exposure than the methodology underlying the 15% Cap, and therefore cannot be used to track compliance with the 15% Cap.  In short, Plaintiff's exclusive reliance on figures stated in the QIRs is fatal to his claim because this apples-to-oranges comparison says nothing about whether the 15% Cap, as it is expressly defined in the prospectuses, has actually been exceeded.  Thus, Plaintiff fails to plead any breach of the specific terms of the "contract" Plaintiff alleges.  *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 939 (9th Cir. 2012) (noting that "'unadorned, the-defendant-unlawfully-harmed-me accusation[s]' [are] insufficient to survive a motion to dismiss") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## III.   PLAINTIFF FAILS TO PLEAD THE BREACH OF ANY FIDUCIARY DUTY

Plaintiff's breach of fiduciary duty claim is asserted only against the Trustees and yet the Trustees are barely even mentioned in the FAC, and only then for the principal purpose of identifying them.  Indeed, the full extent of Plaintiff's allegations against the Trustees is contained in only four paragraphs in the FAC.  Paragraph 70 recites the truism that Trustees cannot unilaterally take actions that require shareholder approval, which, as discussed above, is not implicated in this case as a matter of law.  Paragraphs 93 and 94 allege the legal conclusion that the Trustees held fiduciary duties to the shareholders.  Finally, Paragraph 96 alleges, without explanation or elaboration, that the Trustees "caused the 15% cap on emerging market investments to be exceeded negligently, with bad faith, willfully, with gross negligence, and/or reckless disregard of their fiduciary duties." FAC ¶ 96.  The FAC says nothing about how the Trustees "caused" this to occur, how such an occurrence would constitute a breach of the fiduciary duties outlined in

Paragraphs 93 and 94, or how the Trustees acted "negligently," much less "with bad faith, willfully, with gross negligence, and/or reckless disregard of their fiduciary duties."  *Id.*  The FAC lacks a single allegation about the extent to which the Trustees informed themselves about these investments or the extent to which the Trustees exercised their reasonable business judgment.  Further, there is no factual allegation demonstrating any conflicts of interest.  The one sentence allegation that the Trustees "caused the 15% cap on emerging market investments to be exceeded," *id.*, without even the barest explanation as to <u>how</u> they "caused" this to happen or why such an action would be a breach of fiduciary duty, is precisely the type of "vague allegations with no factual support" that cannot survive a motion to dismiss. *See Lacey*, 693 F.3d at 939.[12]

Further, the Declaration of Trust, which is expressly incorporated into the FAC (FAC ¶ 70) states that "No Trustee, . . . shall be liable to the Trust, its Shareholders, or to any Shareholder, Trustee, officer, employee, or agent thereof for any action or failure to act (including without limitation the failure to compel in any way any former or acting Trustee to redress any breach of trust) except for his own bad faith, willful misfeasance, gross negligence or reckless disregard of the duties involved in the conduct of his office."  Hess Decl. Ex. I at 175.  The FAC is devoid of any factual allegation suggesting that any Trustee acted with bad faith, willful misfeasance, gross negligence, or reckless disregard.  Under Massachusetts law, this exculpatory provision is valid and bars Plaintiff's conclusory breach of

---

[12] The claim also fails because the FAC is clear that "Lead Plaintiff brings this action . . . on behalf of all persons who *purchased or otherwise acquired* shares of [the] Fund during the Class Period."  FAC ¶ 76 (emphasis added).  While the federal securities laws may protect purchasers against alleged misstatements or omissions in offering materials, the state law governing fiduciaries does not.  *See, e.g.*, *In re Omnicom Grp. Inc., Sec. Litig.*, 233 F.R.D. 400, 412 (S.D.N.Y. 2006) (finding that no fiduciary duty was owed to plaintiffs who were not yet shareholders at the time of the purchase but members of the investing public); *In re Atlantic Fin. Mgmt. Sec. Litig.*, 121 F.R.D. 141, 146 (D. Mass. 1988) (same).

fiduciary duty claim against the Trustees.  *See, e.g.*, *Blake v. Smith*, 22 Mass. L. Rptr. 173, at *32 (Mass. Super. Ct. 2006) (dismissing fiduciary duty claim where "plaintiff's well-pleaded allegations state no more than due care claims, which are barred by the exculpatory provision").

Finally, both Massachusetts and federal law would also bar Plaintiff's fiduciary breach claim even if Plaintiff's characterization of his claim was genuine. Plaintiff would have this Court believe that this case is not about alleged misrepresentations and omissions (despite all evidence to the contrary), but is, instead, about the deprivation of the shareholders' purported right to vote on any change to the alleged policy restricting investment in emerging markets as required under the ICA.  *See* FAC ¶¶ 69, 89.  But even if that were true—and it is not— that claim would be based on Section 13(a) of the ICA, and not on vague assertions regarding fiduciary duties.  Section 13(a) prohibits a fund from "deviat[ing] from any investment policy which is changeable only if authorized by a shareholder vote," 15 U.S.C. § 80a-13(a)(3), but that provision cannot be enforced through any private cause of action.  *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 615 F.3d 1106, 1115 (9th Cir. 2010).  In a transparent attempt to create a cause of action where none exists, Plaintiff repackages this claim under the banner of fiduciary duties.  Such an attack is prohibited under Massachusetts law because the alleged violation of a statutory obligation does "not amount to a breach of fiduciary duty." *O'Brien v. Pearson*, 868 N.E.2d 118, 125 n.7 (Mass. 2007); *In re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510 WHA, 2009 WL 1371409, at *6 (N.D. Cal. May 15, 2009) (plaintiff must establish "how the alleged violation of the ICA would activate any non-ICA fiduciary duties").  Plaintiff cannot now seek an end-run around Congress's decision not to create a private right of action for violation of Section 13(a) of the ICA through his common-law breach of fiduciary duty claim.

## IV.   THE NINTH CIRCUIT'S *NORTHSTAR* DECISION IS INAPPICABLE TO PLAINTIFF'S CLAIMS

The Ninth Circuit's recent opinion in *Northstar* provides no basis for rescuing Plaintiff's claims, as *Northstar*'s reasoning is wholly inapplicable here. Plaintiff is presumably relying on *Northstar* in an attempt to create a contract based on the Fund's prospectus, where the Ninth Circuit has clearly held in *McKesson* and *Cohen* that none exists.  But *Northstar* did <u>not</u> hold that contracts are formed whenever shareholders purchase mutual fund shares pursuant to prospectuses. *Northstar* involved a plainly distinguishable fact pattern where a mutual fund went through a fundamental restructuring that called for a new name, new goals, new investment strategies, and, most importantly, new fundamental investment policies. *Northstar*, 779 F.3d at 1040-41.  Unlike other aspects of a prospectus, a mutual fund is required under the ICA to seek shareholder approval in order to modify a fundamental investment policy. 15 U.S.C. § 80a-13(a)(3).  To that end, the fund at issue in *Northstar* issued a proxy statement soliciting a shareholder vote to approve of the restructuring.  In that proxy statement, the fund sought approval for new "fundamental investment objectives."  Shareholders of the fund voted in favor of the restructuring and those fundamental investment objectives were put in place and restated in various prospectuses and other filings.  When the fund allegedly deviated from these "fundamental investment objectives," certain shareholders filed a breach of contract claim.

After the district court dismissed the breach of contract claim because the shareholders had not established the existence of any enforceable contract, the Ninth Circuit reversed.[13]  Specifically, the Ninth Circuit observed that "the mailing

---

[13] The Ninth Circuit expressly declined to address whether such claims were precluded by SLUSA.  *Northstar*, 779 F.3d at 1050.  On remand, the district court held the breach of contract and breach of covenant claims were precluded by SLUSA, and allowed only the fiduciary breach claims to go forward based on waiver concerns not applicable here.  *See generally Northstar Fin. Advis. v. Schwab*

of the proxy statement and the adoption of the two fundamental investment policies after the shareholders voted to approve them, and the annual representations by the Fund that it would follow these policies are sufficient to form a contract between the shareholders on the one hand and the Fund and the Trust on the other." *Northstar*, 779 F.3d at 1054.  Notably, the *Northstar* panel distinguished the facts before it from the facts present in *McKesson* – in which no contract was found – on the grounds that *Northstar* was "predicated, in part, on the approval of the fundamental investment objectives by the shareholders." *Id.* at 1053.  The Court observed that these fundamental investment objectives "*when they were adopted by the shareholders*, . . . added a structural restriction on the power conferred on the Trustees . . . that can only be changed by a vote of the shareholders." *Id.* at 1051 (emphasis added).  Accordingly, *Northstar*'s narrow exception to the general rule that prospectuses do not form contracts can be stated as follows:  When a mutual fund asks its shareholders to approve of a change in the fund's fundamental investment policies via a shareholder vote and the shareholders vote in favor of that change, then the shareholders could acquire a contractual right to enforce those fundamental investment policies until they are changed by a subsequent shareholder vote. *Id.*

  *Northstar* is not in any logical way analogous to the claims asserted in the FAC.  Critically, the 15% Cap that serves as the basis of Plaintiff's claims is <u>not</u> a fundamental investment policy.  As required by law, the Fund's prospectuses, including the SAIs, separately list the Fund's fundamental policies and a plain reading of those documents demonstrates that the 15% Cap was <u>not</u> included in the list of fundamental investment policies.  July 25, 2014 Prospectus at 26-27.  Further, the shareholders were never asked to "approve" of the 15% Cap via shareholder vote, and the FAC does not allege otherwise.  Whereas *Northstar*

*Investments*, No. 5:08-cv-04119-LHK (N.D. Cal. Oct. 5, 2015).

1   addressed a situation where shareholders voted for a fundamental investment policy

2   and that policy was allegedly changed without their consent, here no fundamental

3   investment policy is implicated and the specific guidance on which Plaintiff relies

4   was <u>never</u> "offered to" and "accepted by" the shareholders in a shareholder vote in

5   the first place.  Plaintiff simply cannot establish the essential elements of contract

6   formation that were arguably present in *Northstar* and, thus, Plaintiff's breach of

7   contract claims are barred by *McKesson* and *Cohen*'s general rule that prospectuses

8   cannot form the basis of contracts.

9       By the same token, the holding in *Northstar* does not alter the settled legal

10  conclusion that no fiduciary duty is owed to purchasers, but only holders.  Nowhere

11  does *Northstar* address whether purchasers of the shares are owed a fiduciary duty

12  in connection with their purchase – much less suggest that the answer is yes.  As

13  stated *supra*, there is no legal foundation for a state law fiduciary duty to

14  purchasers; *Northstar* does not change this.

15  **V.    EACH OF PLAINTIFF'S CLAIMS FAILS BECAUSE THE CLAIMS
        MUST BE ASSERTED DERIVATIVELY**

16

17      Massachusetts law is clear that when an alleged wrongful action causes a

18  mutual fund's value to depreciate, thus causing a consequential decrease in the

19  value of every shareholder's shares, it is the <u>mutual fund</u>, not the shareholders, that

20  owns the claim against the actor.  *Halebian v. Berv*, 931 N.E.2d 986, 987-88 (Mass.

21  2010).  Courts applying Massachusetts law, including the Ninth Circuit and this

22  Court, have routinely held that shareholder claims like those alleged by Plaintiff

23  may only be asserted on the fund's behalf in a derivative action.  Massachusetts

24  statutory law includes a universal board demand requirement, such that claims

25  asserted on behalf of a mutual fund may only be brought following demand upon

26  the board – with no exception for alleged futility.  Mass. Gen. Laws ch. 156D §

27  7.42; *see also Halebian v. Berv*, 931 N.E.2d 986, 987-88 (Mass. 2010) (applying

28  universal board demand statute to derivative claims brought on behalf of mutual

1  fund).  Accordingly, Plaintiff's claims are derivative and must be dismissed for
2  failure to make the required demand on the Fund's board.
3      In *Lapidus v. Hecht*, 232 F.3d 679 (9th Cir. 2000), the Ninth Circuit
4  distinguished between claims that could be brought directly by fund shareholders
5  under Massachusetts law and those that must be brought derivatively.  On the one
6  hand, "[t]o bring a direct action under Massachusetts law, a plaintiff must allege an
7  injury distinct from that suffered by shareholders generally or a wrong involving
8  one of his or her contractual rights as a shareholder, such as the right to vote."  *Id.*
9  at 683.  By contrast, a shareholder must bring a *derivative* action "when the alleged
10  injury is inflicted on the corporation and the only injury to the shareholder is the
11  indirect harm which consists of the diminution in the value of his or her shares."
12  *Id.*  Judge Selna of this Court applied *Lapidus* in dismissing fund shareholders'
13  Massachusetts state-law claims in *Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1028
14  (C.D. Cal. 2005) ("If the injury merely is a reduction in the price of stock, then the
15  suit must be derivative.").  Here, the injury claimed by Plaintiff—that the Fund's
16  purported overexposure to "risky emerging markets" "harm[ed] investors *by*
17  *causing the Fund losses*" (FAC ¶ 68 (emphasis added))—is inarguably a harm to
18  the Fund in the first instance, requiring that the claims be brought derivatively.[14]
19      The Ninth Circuit's recent decision in *Northstar* is wholly inapplicable.  In
20  *Northstar,* the shareholders alleged a violation of their individual contractual rights
21  to vote upon any change to a fund's fundamental investment policies and the Ninth
22  Circuit's ruling thus followed from its earlier holding in *Lapidus* that direct claims
23  could be premised upon the plaintiff's "contractual rights as a shareholder, such as
24  the right to vote."  *Lapidus*, 232 F.3d at 683.  Here, by contrast, as explained above,
25
26  ───────────────
[14] Massachusetts has regularly rejected direct claims that seek to remedy harm to
27  the funds in the first instance.  *See, e.g.*, *Forsythe v. Sun Life Fin., Inc.*, 417 F.
   Supp. 2d 100, 112 (D. Mass. 2006); *In Re Columbia Entities Litig.*, Civil Action
28  No. 04-11704-REK, 2005 WL 6776751, at *4 (D. Mass. Nov. 30, 2005).

Plaintiff has not plausibly pled a contractual right to vote on the Cap and therefore cannot allege that he has suffered any direct harm that could give rise to a direct claim.  Plaintiff's allegation that the Fund's investments in "risky emerging markets" "harm[ed] investors by causing the Fund losses" (FAC ¶ 68) effectively concedes that the Fund suffered the alleged harm in the first instance.

## VI.    PLAINTIFF FAILS TO PLEAD A CLAIM FOR AIDING AND ABETTING

As set forth above, Plaintiff's fiduciary breach claim must be dismissed because it is precluded by SLUSA, based on a non-existent contract, inadequately pled, barred by an exculpatory clause, and improperly asserted as a direct claim. Accordingly, the aiding and abetting claim against PIMCO must also fail because Plaintiff cannot maintain a claim for aiding and abetting in the absence of a valid claim against the principal actor. *See Arcidi v. Nat'l Ass'n of Gov't Emps., Inc.*, 856 N.E.2d 167, 174 (Mass. 2006).  Further, the FAC contains no factual allegations that even suggest, much less establish, that PIMCO (1) had actual knowledge that any other Defendant was breaching a fiduciary duty or (2) possessed such knowledge and decided to actively participate in the breach. *See Spinner v. Nutt*, 631 N.E.2d 542, 546-47 (Mass. 1995).  Accordingly, Plaintiff's claim for aiding and abetting asserted against PIMCO should be dismissed.

## CONCLUSION

For the reasons set forth above, Plaintiff's FAC should be dismissed without leave to amend.

Dated:        October 5, 2015                Respectfully Submitted,

DECHERT LLP

By: /s/    *Matthew L. Larrabee*
Matthew L. Larrabee
Joshua D. N. Hess
633 West 5th Street, 37th Floor
Los Angeles, CA 90071

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

David A. Kotler (*pro hac vice*)
Suite 500
902 Carnegie Center
Princeton, NJ 08540-6531

*Attorneys for Defendants PIMCO Funds,
E. Philip Cannon, J. Michael Hagan,
Ronald C. Parker, and Vern O. Curtis*

LAW OFFICE OF FRANK D. RORIE JR.
Frank D. Rorie Jr.
8335 Sunset Boulevard, Suite 303
West Hollywood, CA 90069

ROPES & GRAY LLP
John D. Donovan, Esq. (*pro hac vice*)
Robert A. Skinner, Esq. (*pro hac vice*)
Amy D. Roy, Esq. (*pro hac vice*)
Prudential Tower, 800 Boylston Street
Boston, MA 02199

John C. Ertman, Esq. (*pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036

*Attorneys for Defendant Pacific
Investment Management Company LLC,
Brent R. Harris, and Douglas M. Hodge*

BROWN RUDNICK LLP
Ronald Rus, Esq.
Randall A. Smith, Esq.
Leo J. Presiado, Esq.
2211 Michelson Drive, 7th Floor
Irvine, CA 92612

*Attorneys for Defendant William J.
Popejoy*