JEFF S. WESTERMAN (SBN 94559)
E-mail: jwesterman@jswlegal.com
WESTERMAN LAW CORP
1900 Avenue of the Stars, 11th Floor
Los Angeles, California 90067
Telephone: (310) 698-7880
Facsimile: (310) 775-9777

*Attorneys for William T. Hampton*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM T. HAMPTON, Individually and on Behalf of All Others Similarly Situated,<br><br>                      Plaintiff,<br><br>      v.<br><br>PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, PIMCO FUNDS, E. PHILIP CANNON, J. MICHAEL HAGAN, BRENT R. HARRIS, DOUGLAS M. HODGE, RONALD C. PARKER, VERN O. CURTIS, WILLIAM J. POPEJOY,<br><br>                      Defendants. | No. 8:15-CV-00131-CJC-JCG<br><br>Hon. Cormac J. Carney<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:  November 2, 2015<br>Time: 1:30 p.m.<br>Courtroom: 9B |

## MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

TABLE OF AUTHORITIES....................................................................................ii

I.      PRELIMINARY STATEMENT .................................................................1

II.     STATEMENT OF FACTS ..........................................................................2

    A.    PIMCO and the Total Return Fund ................................................2

    B.    The Fund's "Principal Investment Strategies" ...............................3

    C.    Defendants Violated the "Principal Investment Strategies" .............3

    D.    The Breach Results in Damages to Shareholders ...........................4

    E.    Defendants Modify the Contract Without Shareholder Approval ........5

III.    LEGAL STANDARD ..................................................................................6

IV.     ARGUMENT................................................................................................6

    A.    Plaintiff Properly Pleads a Breach of Contract Claim and a Claim for Breach of the Covenant of Good Faith and Fair Dealing .....................6

        1.  PIMCO's Prospectus Was a Contract ............................................6

        2.  PIMCO Breached Its Contract with Shareholders and Violated the Covenant of Good Faith and Fair Dealing ....................................9

        3.  Plaintiff's Claims Are Direct, Not Derivative..............................13

    B.    Plaintiff's Complaint Properly Alleges Breach of Fiduciary Duty......14

        1.  Plaintiff's Complaint Sets forth Each Element of the Claim .......14

        2.  Plaintiff's Claims Do Not "Sound In" Violation of the Investment Company Act.................................................................17

        3.  The Exculpatory Provision Does Not Defeat Plaintiff's Claims .18

    C.    SLUSA Does Not Apply to Plaintiff's Claims ...................................19

        1.  Plaintiff Alleges Breach of Contract and Not Misrepresentation 19

        2.  Plaintiff's Claims Do Not Arise from a Purchase or Sale of a Security .........................................................................................22

        3.  In Any Event, Plaintiff's Claims Are Excluded from SLUSA Pursuant to the Delaware Carve-Out Exception..........................22

    D.    Plaintiff Adequately Alleges Aiding and Abetting .............................24

V.      CONCLUSION............................................................................................25

# **TABLE OF AUTHORITIES**

**Cases**

*Anthony's Pier Four, Inc. v. HBC Assocs.*,
  583 N.E.2d 806 (Mass. 1991)...............................................................7

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................6, 14

*Barranco v. Milford Hous. Authy.*,
  562 N.E.2d 74 (Mass. 1990).............................................................12

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..........................................................................6

*Berish v. Bornstein*,
  770 N.E.2d 961 (Mass. 2002)......................................................17, 18

*Blake v. Smith*,
  2006 Mass. Super. LEXIS 668 (Mass. Super. Ct. 2006)....................19

*In re Caremark Int'l Inc. Deriv. Litig.*,
  698 A.2d 959 (Del. Ch. 1996) ..........................................................18

*In re Charles Schwab Corp. Secs. Litig.*,
  2010 U.S. Dist. LEXIS 32113 (N.D. Cal. Mar. 30, 2010) ........10, 11, 18

*City of Ann Arbor Emples. Ret. Sys. v. Gecht*,
  2007 U.S. Dist. LEXIS 21928 (N.D. Cal. Mar. 9, 2007) ....................24

*Cohen v. Stratosphere Corp.*,
  115 F.3d 695 (9th Cir. 1997) ..........................................................8, 9

*Crimi v. Barnholt*,
  2008 U.S. Dist. LEXIS 108469 (N.D. Cal. Sept. 17, 2008)................24

*Daniels-Hall v. Nat'l Educ. Ass'n*,
  629 F.3d 992 (9th Cir. 2010) .............................................................6

*Demoulas v. Demoulas*,
  1993 Mass. Super. LEXIS 91 (Mass. Super. Ct. Oct. 4, 1993)....................18, 19

*Dill v. Boston Safe Deposit & Trust Co.*,
   175 N.E.2d 911 (Mass. 1961)...........................................................19
*Doe v. Harbor Schs., Inc.*,
   843 N.E.2d 1058 (Mass. 2006)........................................................14
*Druker v. Roland Wm. Jutras Assocs., Inc.*,
   348 N.Ed.2d 763 (Mass. 1976)...........................................................6
*Falkowski v. Imation Corp.*,
   309 F.3d 1123 (9th Cir. 2002)........................................................22
*Fogelin v. Nordblom*,
   521 N.E.2d 1007 (Mass. 1988).........................................................15
*Georgia-Pacific v. Officemax Inc.*,
   2013 U.S. Dist. LEXIS 133657 (N.D. Cal. Sept. 18, 2013)..............................12
*Graphic Arts Finishers, Inc. v. Boston Redevelopment Auth.*,
   255 N.E.2d 793 (Mass. 1970)............................................................8
*Hanover Ins. Co. v. Sutton*,
   705 N.E.2d 279 (Mass. App. Ct. 1989).................................................14
*In re Kingate Mgmt. Ltd. Litig.*,
   784 F.3d 128 (2d Cir. 2015)......................................................20, 21
*Lapidus v. Hecht*,
   232 F.3d 679 (9th Cir. 2000)...................................................7, 8, 13
*Lazar v. Gregerson*,
   2002 U.S. Dist. LEXIS 6152 (N.D. Cal. Apr. 5, 2002)..................................24
*Lopez v. Smith*,
   203 F.3d 1122 (9th Cir. 2000)........................................................26
*Madden v. Cowen & Co.*,
   576 F.3d 957 (9th Cir. 2009).....................................................23, 24
*Marsman v. Nasca*,
   573 N.E.2d 1025 (Mass. App. Ct. 1991)................................................19

1   *McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.*,

2      339 F.3d 1087 (9th Cir. 2003) ..................................................................8

3   *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,

4      547 U.S. 71 (2006) ..................................................................................22

5   *In re Metlife Demutualization Litig.*,

6      2006 U.S. Dist. LEXIS 60104 (E.D.N.Y. Aug. 7, 2006) ...................................24

7   *NAF Holdings LLC v. Li & Fung (Trading) Ltd.*,

8      118 A.3d 175 (Del. 2015) .......................................................................13

9   *Neilson v. Union Bank of Cal., N.A.*,

10     290 F. Supp. 2d 1101 (C.D. Cal. 2003) ........................................................25

11  *Northstar Fin. Advisors Inc. v. Schwab Investments*,

12     2015 U.S. App. LEXIS 7027 (9th Cir. Apr. 28, 2015) ........................15, 17, 18

13  *Northstar Fin. Advisors Inc. v. Schwab Investments*,

14     779 F.3d 1036 (9th Cir. 2015) ............................................................passim

15  *Northstar Fin. Advisors, Inc. v. Schwab Invs.*,

16     615 F.3d 1106 (9th Cir. 2010) ................................................................17

17  *Northstar Financial Advisors, Inc. v. Schwab Investments*,

18     2015 U.S. Dist. LEXIS 135847 (N.D. Cal. Oct. 5, 2015) ...........................passim

19  *O'Brien v. Pearson*,

20     851 N.E.2d 1093 (Mass. App. Ct. 2006) ....................................................18

21  *O'Brien v. Pearson*,

22     868 N.E.2d 118 (Mass. 2007) .................................................................17

23  *Reynolds v. City Express, Inc.*,

24     2014 Mass. Super. LEXIS 44 (Mass. Super. Ct. Jan. 7, 2014) ..........................25

25  *SEC v. Zandford*,

26     535 U.S. 813 (2002) ..............................................................................22

27  *Singarella v. Boston*,

28     173 N.E.2d 290 (Mass. 1961) ....................................................................6

*Spinner v. Nutt*,

 631 N.E.2d 542 (Mass. 1994)........................................................................25

*The Woodward School for Girls, Inc. v. City of Quincy*,

 13 N.E.3d 579 (Mass. 2014)........................................................................16

*Tibble v. Edison International*,

 135 S. Ct. 1823 (2015) ...............................................................................16

*United States v. Ritchie*,

 342 F.3d 903 (9th Cir. 2003) ......................................................................13

*Van Brode Group, Inc. v. Bowditch & Dewey*,

 633 N.E.2d 424 (Mass. App. Ct. 1994) ......................................................14

*Walling v. Beverly Enters.*,

 476 F.2d 393 (9th Cir. 1973) ......................................................................20

*Webster v. N.Y. Life Ins. and Annuity Corp.*,

 386 F. Supp. 2d 438 (S.D.N.Y. 2005) ........................................................20

**Statutes**

15 U.S.C. § 77p ...............................................................................24, 25

15 U.S.C. § 78bb ...............................................................................1, 20, 23

15 U.S.C. § 80a-8 ...............................................................................10

15 U.S.C. § 80a-13 ...............................................................................10, 11

MUTC, G. L. c. 203E ...............................................................................15

**Other Authorities**

*The Oxford Dictionary*, Oct. 12, 2015, http://www.oxforddictionaries.com.........11

**Rules**

Fed. R. Civ. P. 8 ...............................................................................6

Fed. R. Civ. P. 12 ...............................................................................6

## I.   **PRELIMINARY STATEMENT**

Plaintiff William T. Hampton ("Plaintiff") brings this action to recover damages against Defendants for breach of their contract with shareholders of PIMCO's Total Return Fund (the "Fund") and fiduciary duties owed as trustees to the shareholder-beneficiaries. PIMCO, as investment advisor for the Fund, is responsible for investing the assets of the Fund which, until recently, totaled well over $100 billion. PIMCO executed its investment obligations in accordance with the Fund's "Principal Investment Strategies." This lawsuit centers on Defendants' failure to follow one of the Fund's "Principal Investment Strategies." In particular, Defendants breached a restriction against investing more than 15% of the Fund's assets in investments tied to emerging market countries.[1]

Beginning in the second quarter of 2014, the Fund's quarterly report confirmed that over 21% of its assets were invested in emerging market countries, including large positions in Mexico, Brazil, and Russia. Defendants' failure to comply with the Fund's prospectus over-exposed investors to a concentration of investments that grossly underperformed and caused millions of dollars in losses.

Defendants attempt to avoid liability largely on a procedural argument that does not apply to the substantive claims. In an effort to dismiss this action under the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb ("SLUSA"), Defendants argue that Plaintiff's First Amended Class Action Complaint, Dkt. No. 21 (the "Complaint"), is a claim for securities fraud disguised as a breach of contract. Inherent in their argument is that a breach of contract claim is not covered by SLUSA. Plaintiff's Complaint is for breach of contract and fiduciary duty. It is devoid of any allegation of fraud or misrepresentation; in fact, Plaintiff's Complaint

---

[1]   "Defendants" refers to Pacific Investment Management Company LLC ("PIMCO"), PIMCO Funds, E. Philip Cannon, J. Michael Hagan, Brent R. Harris, Douglas M. Hodge, Ronald C. Parker, Vern O. Curtis, and William J. Popejoy. Collectively, Cannon, Hagan, Harris, Hodge, Parker, Curtis, and Popejoy are referred to as the "Trustees."

explicitly denies such allegations and makes clear that PIMCO truthfully disclosed both the terms of its Principal Investment Strategies and its emerging market investments. These disclosures, however, reveal a breach of the Fund's terms, giving rise to direct claims by the Fund's shareholders.

Alternatively, Defendants claim that PIMCO never invested more than 15% of the Fund's *total* assets in emerging market investments, and the Fund's quarterly reports indicating that emerging market investments equaled more than 21% concerned *net* assets. Defendants provide no proof in support of the contractual or factual bases of this argument, which falls outside the corners of the Complaint and is exceedingly fact-intensive and improper at this stage of the litigation. Indeed, to the extent it can be calculated from PIMCO's public disclosures, 21% of the Fund's *net* assets during the Class Period still exceeded 15% of its *total* assets.

For each claim, the Complaint pleads facts providing a "short and plain statement of the claim" in accordance with notice pleading standards under Federal Rule of Civil Procedure ("Rule") 8. Accepting the Complaint's allegations as true and construing them in the light most favorable to Plaintiff, the motion to dismiss should be denied.

## II.  STATEMENT OF FACTS

### A.  PIMCO and the Total Return Fund

PIMCO is an investment management company headquartered in Newport Beach, California. ¶2.[2] The Company operates a multitude of exchange-traded, closed-end, and open-end funds. ¶3. The Company's open-end funds, otherwise known as mutual funds, are sponsored by defendant PIMCO Funds, which is a Massachusetts business trust registered under the Investment Company Act of 1940 (the "Trust"). ¶3. The Trust was established by a Declaration of Trust which provided that the Trust's Trustees "may exercise each of the powers granted to them in [the] Declaration without the vote, approval or agreement of the Shareholders,

---

[2] Citations to "¶__" and "¶¶__" refer to the Complaint.

1  unless such a vote, approval or agreement is required by the 1940 Act or applicable

2  laws of the Commonwealth of Massachusetts." ¶70.

3  **B.      The Fund's "Principal Investment Strategies"**

4  PIMCO bills the Fund as offering a "maximum total return, consistent with

5  preservation of capital and prudent investment management." ¶5. Defendants

6  referred to this overarching goal as the Fund's "Investment Objective." ¶5.

7  Defendants sought to accomplish this goal by investing in accordance with a

8  carefully predetermined framework or, in Defendants' words, "Principal

9  Investment Strategies." Defendants' "Principal Investment Strategies" included the

10  following investment rules, restrictions, and targets:

11  • "investing under normal circumstances at least 65% of its total assets in
12     a diversified portfolio of Fixed Income Instruments of varying
       maturities"

13  • "The Fund invests primarily in investment-grade debt securities, but
14     may invest up to 10% of its total assets in high yield securities ("junk
       bonds") rated B or higher . . . ."
15

16  • "The Fund may invest up to 30% of its total assets in securities
       denominated in foreign currencies, and may invest beyond this limit in
17     U.S. dollar-denominated securities of foreign issuers."

18  • **"The Fund may invest up to 15% of its total assets in securities and
       instruments that are economically tied to emerging market**
19     **countries."**

20  • "The Fund will normally limit its foreign currency exposure (from non-
21     U.S. dollar-denominated securities or currencies) to 20% of its total
       assets."
22

23  • "The Fund may invest up to 10% of its total assets in preferred stock,
       convertible securities and other equity-related securities."

24  ¶48 (emphasis added).

25  **C.      Defendants Violated the "Principal Investment Strategies"**

26  Defendants' conduct with respect to the Fund's promise of limiting

27  investments in emerging market industries to 15% of assets gives rise to the claims

28

asserted in the Complaint. In violation of this promise, the Fund's quarterly report for the second quarter of 2014 indicated that the Fund had in fact exceeded that threshold. ¶51. As of June 30, 2014, the Fund's investments reflected emerging market positions in excess of 21% of the Fund's assets, including 9.3% in Mexico, 6.4% in Brazil, and 1.4% in Russia. ¶51.

Defendants continued to breach the terms of the Fund's "Principal Investment Strategies" over the course of the following quarter. For the third quarter of 2014, the Fund's quarterly report confirmed that the Fund's emerging markets investments totaled almost 23% of the Fund's assets as of September 30, 2014, including 8.8% in Mexico, 7.9% in Brazil, and 1.5% in Russia. ¶52.

Upon information and belief, the Fund's emerging market investments continue to be in excess of 15%.

**D.    The Breach Results in Damages to Shareholders**

Defendants' violation of the Fund's "Principal Investment Strategies" resulted in excess and unnecessary losses to the Fund. As described in a December 17, 2014 New York Times article entitled "A Wager on Emerging Markets That Seems Poorly Timed," "bonds and currencies in Brazil, Mexico, and Russia [] plunged" in 2014. ¶53. The article continues, describing PIMCO's emerging market investments in particular as follows:

> Pimco's outsize wager on emerging markets seems at the moment to be particularly ill timed. Many of its big positions are in local currency bonds and derivatives of oil-dependent economies like Mexico, Brazil and Russia. These securities have tumbled with falling oil prices and a strong dollar.

¶53.[3]

---

[3] Contributing to the decline of the Fund's emerging market investments was the fact that a number of corporate bonds issued by emerging market state-owned energy companies declined in value in response to crude oil prices. ¶¶54, 61-62. Additionally, Brazilian investments suffered in response to the sprawling allegations of corruption centered on Petróleo Brasiliero S.A. ¶¶55-58. Likewise,

The Fund's over-exposure to emerging markets resulted in significant damages to investors. As the New York Times reported, the Fund held "big positions . . . in local currency bonds and derivatives of oil-dependent economies like Mexico, Brazil and Russia [that] have tumbled with falling oil prices and a strong dollar." Had Defendants complied with the terms of the Fund's "Principal Investment Strategies," the Fund's losses would have been less. ¶¶64, 72-73.

### E. Defendants Modify the Contract Without Shareholder Approval

On September 12, 2014, without any advance notice, Defendants announced unilaterally that the Fund's "Principal Investment Strategy" concerning emerging market investments was being modified. ¶65. As stated in Defendants' supplement to the prospectus, "[e]ffective October 14, 2014, for the [Fund], percentage limitations on investments in securities and instruments that are economically tied to emerging market countries, as disclosed in the Principal Investment Strategies or elsewhere in the Prospectuses, do not apply to investment grade sovereign debt denominated in the local currency with less than 1 year remaining to maturity." ¶65. This supplement was the first prospectus indicating to investors that the Fund's investment in emerging markets could exceed 15% of the Fund's assets. ¶66.

Defendants' unilateral modification to the Fund's "Principal Investment Strategies" after the damage was done was unauthorized and in violation of the Investment Company Act of 1940, 15 U.S.C. § 80a-3 (the "ICA"). Pursuant to the ICA, Defendants were required to hold a shareholder vote prior to deviating from the Fund's restriction against investing more than 15% of the Fund's assets in emerging markets—Defendants failed to hold this vote. ¶71.

Defendants' unauthorized and improper actions damaged Plaintiff and other similarly situated investors. For the reasons set forth below, Defendants' motion to dismiss should be denied in its entirety.

---

Russian investments suffered from fund-holding sanctions imposed by the United States and European Union over Russia's invasion of Ukraine. ¶¶59-60.

### III.   LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain only enough factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A motion under Rule 12(b)(6), such as Defendants' motion here, requires a court to determine whether or not it contains a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In making this determination, courts must "accept as true all well-pleaded allegations of material fact, and construe them in the light most favorable to the nonmoving party." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

### IV.   ARGUMENT

**A.   Plaintiff Properly Pleads a Breach of Contract Claim and a Claim for Breach of the Covenant of Good Faith and Fair Dealing**

Under Massachusetts law, a plaintiff must plead the following to state a claim for breach of contract: (i) a contract; (ii) performance by the plaintiff; (iii) a breach by the defendant; and (iv) damage to the plaintiff as a result thereof. *See Singarella v. Boston*, 173 N.E.2d 290, 291 (Mass. 1961). Further, "in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing." *Druker v. Roland Wm. Jutras Assocs., Inc.*, 348 N.Ed.2d 763, 765 (Mass. 1976) (quotations omitted). Plaintiff alleges facts sufficient to state a claim under Rule 8(a).

1.   PIMCO's Prospectus Was a Contract

The Fund's prospectus served as a contract between investors and Defendants (specifically, the Trust). The contract established fundamental investment policies and policies relating to concentrations of investments in emerging markets. The Ninth Circuit has repeatedly held that undertakings in SEC filings can give rise to

contractual obligations. *See Northstar Fin. Advisors Inc. v. Schwab Investments*, 779 F.3d 1036 (9th Cir. 2015) ("*Northstar V*"); *Lapidus v. Hecht*, 232 F.3d 679 (9th Cir. 2000). Additionally, a covenant of good faith and fair dealing arises from this contract and thus runs from Trustees, as trustees of the Trust, to the shareholders of the Trust, including Plaintiff. ¶100; *Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806, 821 (Mass. 1991) ("the rule is clear in Massachusetts that every contract is subject to an implied covenant of good faith and fair dealing.")

In *Lapidus*, the Ninth Circuit held there was a valid contract where a Massachusetts trust filed a "prospectus . . . with the SEC [that] provided that the trust could engage in short sales of securities with a value of up to 25% of the value of the mutual fund's total assets." *Lapidus*, 232 F.3d at 681. The trust later amended the limit to "40% of the fund's total assets." *Id*. The "amendment to the short sales restriction was made without shareholder approval" and, consequently, "the mutual fund's short sale position had increased to 25-35% of the mutual fund's assets and the mutual fund suffered substantial losses." *Id*. The Ninth Circuit held that the plaintiffs possessed a contractual right under the ICA to vote on proposed changes to the mutual fund's investment policy. *Id*.

The Ninth Circuit confirmed that a prospectus can be a contract in *Northstar V* stating that "[t]he prospectus, which is the primary selling document, offers to sell shares to investors in a mutual fund which will invest the proceeds in the manner described in the prospectus, unless shareholders approve a proposal to do otherwise." Subsequently, "the purchase of those shares constitutes an acceptance of the offer by the investor." *Id*. at 1054.

Here, as in *Lapidus* and *Northstar V*, the Fund's prospectus provided the terms of the contract. The subsequent "purchase of those shares constitute[d] an acceptance of the offer by the investor." *Northstar V*, 779 F.3d at 1054. Defendants amended the terms of the prospectus without shareholder approval. *See id*. at 1050 (recognizing claims by "existing investors [who] retained shares and new investors

1   [who] purchased shares in consideration for Schwab's contractual obligations"); *see*

2   *also Graphic Arts Finishers, Inc. v. Boston Redevelopment Auth.*, 255 N.E.2d 793,

3   795 (Mass. 1970).

4           Defendants rely on *McKesson HBOC, Inc. v. New York State Common Ret.*

5   *Fund, Inc.*, 339 F.3d 1087 (9th Cir. 2003), for the premise that a prospectus can

6   never serve as the basis for a breach of contract claim. The Ninth Circuit has since

7   explicitly rejected this argument, holding that undertakings in SEC filings can give

8   rise to contractual obligations. *Northstar V*, 779 F.3d at 1054. In *McKesson*, three

9   entities entered into a merger agreement. "Although the Merger Agreement

10  necessarily referred to the stockholders of HBOC and McKesson, and specified that

11  the board of directors of each company would recommend 'approval and adoption'

12  of the merger to its own stockholders, it is clear from the text and the signatories to

13  the agreement that the only parties to the Merger Agreement were the corporations

14  themselves." *McKesson HBOC, Inc.*, 339 F.3d at 1091. Accordingly, "the

15  Prospectus was not an offer by McKesson to the HBOC shareholders to enter into

16  a bilateral contract *separate and apart* from the Merger Agreement." *Id.* at 1092

17  (emphasis added). Unlike the purported merger contract between companies in

18  *McKesson*, the Fund's prospectus served as a direct contract between the Trust and

19  the Fund's shareholders. *Northstar V*, 779 F.3d at 1053-54.

20          Defendants also misplace reliance on *Cohen v. Stratosphere Corp.*, 115 F.3d

21  695 (9th Cir. 1997). Although Defendants partially quote *Cohen* in arguing that

22  "'the mutual assent and intent to be bound that are required for the formation of a

23  contract' are 'absent' when an investor merely purchases shares after reading a

24  prospectus," this is taken out of context and clearly not what the court intended. The

25  quoted portion of the decision in full states:

26          *The Prospectus states that "there can be no assurance that if the*
            *Minimum Offering is achieved that any additional Units will be sold,"*

27          *and reserves the "right to withdraw or cancel such offer and to reject*
            *any subscription in whole or in part."* The mutual assent and intent to

28

1
2

   be bound that are required for the formation of a contract to sell
   securities, therefore, is absent in this case.

3  *Cohen*, 115 F.3d at 701 (emphasis added).

4    The Ninth Circuit in *Cohen* did not prohibit prospectuses from forming the

5 basis of a contract, but rather issued a ruling with respect to the narrow set of facts

6 and the terms of the specific prospectus at issue in the case. In *Cohen*, there was no

7 contract to sell shares because there was no assurance that the parties could perform,

8 and the prospectus explicitly stated they had the "right to withdraw or cancel such

9 offer." Conversely, here the Fund's prospectus definitively stated that investments

10 in emerging markets would be limited to 15%. ¶¶48-49.

11
12

    2. <u>PIMCO Breached Its Contract with Shareholders and Violated</u>
      <u>the Covenant of Good Faith and Fair Dealing</u>

13    Defendants breached the terms of the Fund's prospectus when the Fund's

14 emerging market investments exceeded 15% of the Fund's assets. Defendants raise

15 two arguments in an attempt to avoid this conclusion. Neither is persuasive.

16    <u>First</u>, Defendants claim that they were not obligated to comply with the terms

17 of the Fund's prospectus because they were authorized to change them at any time.

18 This is incorrect. Defendants' conduct was improper and unauthorized under

19 Sections 80a-8 and 80a-13 of the ICA as well as Ninth Circuit precedent.

20    Section 80a-8 of the ICA requires a mutual fund to identify "all investment

21 policies . . . which are changeable only if authorized by shareholder vote" as well

22 as "all policies" that the Fund "deems matters of fundamental policy." 15 U.S.C. §

23 80a-8(b)(2) and (3). Section 80a-13 prohibits mutual funds from (i) "deviat[ing]

24 from its policy in respect of concentration of investments in any particular industry

25 or group of industries as recited in its registration statement", (ii) "deviat[ing] from

26 any investment policy which is changeable only if authorized by shareholder vote",

27 or (iii) "deviat[ing] from any policy recited in its registration statement pursuant to

28 section 80a-8(b)(3) . . . unless authorized by the vote of a majority of its outstanding

1   voting securities." 15 U.S.C. § 80a-13(a).

2   The Fund's emerging markets restriction qualifies as a "fundamental policy"

3   as well as a "policy in respect of concentration of investments in any particular

4   industry." The Fund's "Investment Objective" was to offer a "maximum total

5   return, consistent with preservation of capital and prudent investment

6   management." ¶5. To accomplish this objective, the Fund's prospectus provided

7   investors with approximately six different "Principal Investment Strategies,"

8   including rules concerning fixed income instruments, junk bonds, foreign

9   currencies, and, of course, emerging markets. ¶5. A plain reading of the prospectus

10  gives rise to the inference that these tenets, upon which the Fund would be able to

11  offer its "maximum total return," were key to the Fund's investment strategy; in

12  other words, these rules were the "fundamental polic[ies]" that could not be changed

13  without a shareholder vote pursuant to the ICA. *See Northstar V*, 779 F.3d at 1053

14  ("The mere fact that Congress has chosen to ensure that investors are fully informed

15  of the fundamental investment objectives of mutual funds hardly provides a license

16  to ignore the objectives, enshrined by shareholder approval, which a mutual fund

17  has obligated itself to pursue."); *In re Charles Schwab Corp. Secs. Litig.*, 2010 U.S.

18  Dist. LEXIS 32113, at *4 (N.D. Cal. Mar. 30, 2010) ("When a mutual fund attracts

19  investors based on a diversification policy expressly limiting investments [in an

20  industry], . . . a shareholder vote is required before the fund may reverse field and

21  concentrate more than [that amount].").

22  Additionally, Defendants were prohibited from unilaterally "deviat[ing]"

23  from the emerging markets restriction because it was a "policy in respect of

24  concentration of investments" in a particular industry or group of industries. 15

25  U.S.C. § 80a-13(a)(3). In *Charles Schwab*, the District Court noted that

26  "concentrating investments in a particular industry or group of industries" is a

27  separate requirement from a fund's "fundamental policy." 2010 U.S. Dist. LEXIS

28  32113, at *5. "Industry," as the term is used in the ICA, is construed liberally; in *In*

*re Charles Schwab Corp. Securities Litigation*, for example, the term applied to mortgage backed securities.[4] The District Court reasoned as follows:

> It is true that the 1940 Act did not define "industry or group of industries." Nor has the Commission done so except to the limited guidance it once gave by referring to standard industry classifications in its now-withdrawn Guide 19. This order agrees, as said by the defense, that a promoter is free to define an industry in any reasonable way when it establishes a fund and assumes for the sake of argument that the promoter may unilaterally, even after the fund is up and running, clarify in a reasonable way a definitional line that may otherwise be vague. *But once the promoter has drawn a clear line and thereafter gathers in the savings of investors, the promoter must adhere to the stated limitation unless and until changed by a stockholder vote.*

*Id.* at *20 (emphasis added).

Emerging markets was one of the several concentrations of investments targeted by the Fund. By exceeding the 15% limit on emerging market investments without obtaining prior shareholder approval, Defendants violated the ICA and breached the terms of the prospectus.

Second, Defendants argue that they did not exceed the emerging markets restriction even if they were in fact required to comply with it. Although the Fund's quarterly investment reports stated emerging market investments were in excess of 21% and 23% for the second and third quarters of 2014 (respectively), Defendants argue that these percentages relate to *net* assets as opposed to *total* assets.

Defendants' argument raises questions of fact that cannot be resolved on the face of the pleadings. Significantly, although Defendants imply that the Fund's emerging market investments did not exceed the 15% restriction, Defendants provide nothing in terms of evidence to contradict the Complaint's well-pleaded allegations. While Defendants assert that the emerging market percentages in the

---

[4] The Oxford dictionary defines "industry" as a "particular form or branch of economic or commercial activity." *The Oxford Dictionary*, Oct. 12, 2015, http://www.oxforddictionaries.com.

quarterly investment reports refer to net assets, they cite to a footnote in the reports that refer to another section. Defs. Mot. at 6.[5] The portion of the reports that refer to the Fund's emerging market investments are devoid of anything indicating that the percentages always refer to net assets, or even why it would. Defendants' proposed interpretation of the prospectus is contrary to well-settled principles of contractual interpretation. *See Barranco v. Milford Hous. Authy.*, 562 N.E.2d 74, 76 (Mass. 1990) (identifying relevant contract provision as consistent with its heading); *Georgia-Pacific v. Officemax Inc.*, 2013 U.S. Dist. LEXIS 133657, at *31-33 (N.D. Cal. Sept. 18, 2013) (holding that headings clarify meaning of text).

Further, even accepting that the emerging market percentages refer to *net* assets, the figures reported by the Fund still indicate a breach of the 15% restriction. Defendants misleadingly cite to the *total* and *net* asset figures as of March 31, *2015*, after the end of the Class Period and after the significant reduction in Fund assets following the departure of William Gross and the underperformance of the Fund during the Class Period. As of March 31, *2014*, the Fund's total and net assets were approximately $259 billion and $231 billion, respectively. Assuming that the percentages within the quarterly reports referred to *net* assets (as Defendants argue), the Fund's emerging market investments equaled $48.7 billion. Dividing this figure by the Fund's amount of *total* assets equals a percentage of 18.75%, approximately $14 billion in excess of the 15% limit.[6] Accordingly, it is irrelevant whether the quarterly reports referred to *total* or *net* assets because Defendants violated the 15% restriction in both instances. *See Freeman Invs., L.P. v. Pac. Life Ins. Co.* 704 F.3d

---

[5] Defendants' Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof, Dkt. No. 57, is referred to as "Defs. Mot."

[6] A copy of the relevant portions of PIMCO's Annual Report for the Fund for the period ending March 31, 2014, is attached to the Declaration of Adam M. Apton as Exhibit A. For the reasons set forth in Plaintiff's Request for Judicial Notice, the Court may consider the Annual Report in connection with this motion. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

1110, 1115-16 (9th Cir. 2013) (motion denied where contract "involves a 'disputed truth' about the proper interpretation of the terms of a contract").

### 3. Plaintiff's Claims Are Direct, Not Derivative

*Lapidus* confirms that Plaintiff can bring a direct action under Massachusetts law where there is a "wrong involving one of his or her contractual rights as a shareholder, such as the right to vote." *Lapidus*, 232 F.3d at 683. The Ninth Circuit confirmed this decision in *Northstar V*, holding that the action could be brought directly "because Northstar's breach of contract cause of action rests on the deviation by defendants from two fundamental investment objectives, which required a shareholder vote to be changed, without first obtaining shareholder approval." *Northstar V*, 779 F.3d at 1052. "Until the fundamental investment objectives were amended by shareholder vote, the investors had a contractual right to have the Fund managed in accordance with those objectives." *Id*. A claim enforcing a contractual duty owed to shareholders may be brought directly even if any damages were suffered equally by all shareholders. *Lapidus*, 232 F.3d at 683; *see also NAF Holdings LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175 (Del. 2015).

Plaintiff properly asserts a direct claim because Plaintiff's breach of contract claim rests on the breach of the emerging markets restriction, which required a shareholder vote to be changed. ¶11 ("At no point did the Fund's investors vote to approve a deviation from the 15% cap on emerging market investments"); ¶81(c) ("whether the Fund's investors voted to approve any deviation from specific representations about investments in emerging markets made in the Fund's prospectuses"); ¶88 ("At no time did Lead Plaintiff, or any other member of the Class, vote to modify this contract by altering this material term."). Although Defendants argue that the "only injury" here was a diminution in value, that is clearly not the case considering the fact that Plaintiff brings this class action on behalf of Fund shareholders for damages they incurred directly as a result of being over-exposed to emerging market investments. ¶1 (class action on behalf of persons

invested in the Fund between April 1, 2014 and September 12, 2014). Given that Plaintiff properly pleads a wrong involving shareholder voting rights, and the damages recovered go to the investors, and not to the Fund, a direct suit is proper.

**B.    Plaintiff's Complaint Properly Alleges Breach of Fiduciary Duty**

Under Massachusetts law, a plaintiff adequately pleads a cause of action for breach of fiduciary duty by alleging: (1) a relationship between parties giving rise to the existence of a fiduciary duty; (2) a breach of that duty; (3) damages; and (4) a causal connection between the breach and the damages. *Hanover Ins. Co. v. Sutton*, 705 N.E.2d 279, 288-91 (Mass. App. Ct. 1989). Plaintiff alleges facts sufficient under Rule 8(a) to give notice of the claims to Defendants, which is all that the law requires. *Ashcroft*, 556 U.S. at 678.

1.    Plaintiff's Complaint Sets forth Each Element of the Claim

(a)    *The relationship between Defendants and shareholders of the Fund gives rise to certain fiduciary duties.*

"A fiduciary duty exists 'when one reposes faith, confidence, and trust in another's judgment and advice.'" *Doe v. Harbor Schs., Inc.*, 843 N.E.2d 1058, 1064 (Mass. 2006) (quoting *Van Brode Group, Inc. v. Bowditch & Dewey*, 633 N.E.2d 424, 428 (Mass. App. Ct. 1994). As the Ninth Circuit recognized in *Northstar Financial Advisors, Inc. v. Schwab Investments*, where a trust exists, "the Supreme Judicial Court of Massachusetts has held that '[i]t is axiomatic that the . . . trustees [stand] in a fiduciary relationship to all the beneficiaries of the trust.'" *Northstar Fin. Advisors Inc. v. Schwab Investments*, 2015 U.S. App. LEXIS 7027, at *53-54 (9th Cir. Apr. 28, 2015) (quoting *Fogelin v. Nordblom*, 521 N.E.2d 1007, 1011 (Mass. 1988)). The plain language of the Amended and Restated Declaration of Trust makes clear that the beneficiaries here are the shareholders. Declaration of Joshua D. N. Hess, Dkt. No. 59, Ex. I at § 5.1 ("The interest of the beneficiaries hereunder shall be divided into transferable Shares of beneficial interest . . . ."). Indeed, in its recent opinion in *Northstar Financial Advisors, Inc. v. Schwab*

*Investments*, the Northern District of California considered a similar argument by defendants in that case, who also argued that plaintiffs had failed to plead the existence of a fiduciary duty. 2015 U.S. Dist. LEXIS 135847, at *27 (N.D. Cal. Oct. 5, 2015) ("*Northstar VI*"). *Northstar VI* noted that not a single case relied on by defendants held that a fiduciary duty does not exist between a trust's beneficiaries and the trust's trustees. *Northstar VI*, 2015 U.S. Dist. LEXIS 135847, at *29-30.

> (b)  *Plaintiff pleads a breach of the fiduciary duties owed to the Fund's shareholders by the Trustees.*

Article 10 of the Massachusetts Uniform Trust Code, Part II, Title II, Chapter 203E, provides that "[a] violation by a trustee of a duty the trustee owes to a beneficiary shall be a breach of trust." ¶95. By virtue of their roles as trustees of the Trust, the Trustees owed the Fund's shareholders duties "to use reasonable care and to act in the best interests of the shareholders in investing the Fund's property, to deal fairly, honestly, and in good faith with Lead Plaintiff and the Class, and to avoid conflicts of interest, as well as a duty of utmost loyalty." ¶94. Defendants may characterize these as "legal conclusions" (Defs. Mot. at 18), but they are duties clearly delineated in the Massachusetts Uniform Trust Code. *See* Section 801 ("[T]he trustee ***shall administer the trust*** in good faith, ***in accordance with its terms*** and purposes and the interests of the beneficiaries and in accordance with this chapter." (emphasis added)); Section 802 (duty of loyalty); Section 803 (impartiality); Section 804 ("***A trustee shall administer the trust*** as a prudent person would, ***considering the purposes, terms and other circumstances of the trust***. In satisfying this standard, the trustee shall exercise reasonable care, skill and caution." (emphasis added)).

In pleading a breach of these duties, the allegations in the Complaint could not be clearer: the Trustees committed a breach of trust by, together with PIMCO, investing more than 15% of the Fund's assets in emerging market investments without shareholder approval. ¶¶51-52, 71, 96, 101.

*Northstar VI* noted that the Ninth Circuit has held allegations analogous to those set forth in the Complaint were "'sufficient to support an argument that the Trustees violated both specific restraints imposed by the Shareholders and the officials' duty of care.'" *Northstar VI*, 2015 U.S. Dist. LEXIS 135847, at *35 (quoting *Northstar V*, 779 F.3d at 1059). Moreover, *Northstar VI* further observed that, pursuant to the Supreme Court's opinion in *Tibble v. Edison International*, 135 S. Ct. 1823, 1827-28 (2015), "trustees have a duty to both select prudent investments at the outset and to monitor these investments from time to time." *Id*. Plaintiff's allegations sufficiently plead that Defendant Trustees failed to meet their duty to monitor the Fund's investments in emerging markets. It is of no moment that PIMCO may have recommended this investment strategy, as the ultimate decision of how to invest a trust's assets remains with its trustee(s). *The Woodward School for Girls, Inc. v. City of Quincy*, 13 N.E.3d 579, 591 (Mass. 2014).

> (c) *Plaintiff pleads that the Fund shareholders suffered damages as a direct result of the Trustees' breach of their fiduciary duties.*

The allegations set forth in the Complaint detail how emerging market bonds—particularly those in oil-dependent economies such like Mexico, Brazil, and Russia, in which the Fund invested heavily—significantly underperformed following the decision to invest Fund assets in emerging markets in excess of the 15% limitation set forth in Fund prospectuses. ¶¶53-54, 64, 68, 97, 102. The Complaint also clearly alleges the causal nexus between the "deviation from the specific concentration of investments set forth in the prospectuses [that] constituted a breach of the fiduciary duties which Defendants owed to their investors" "caused the Fund's investors to realize the downside of the emerging market risk." ¶¶72-73. The fund shareholders are therefore entitled to be made whole for the losses incurred as a result of the emerging market investments made in excess of the 15% cap. *Berish v. Bornstein*, 770 N.E.2d 961, 977 (Mass. 2002) ("When a breach of

1  trust occurs, the beneficiary of the trust is entitled to be put in the position he would
2  have been in if no breach of fiduciary duty had been committed.") (internal
3  quotations omitted).

4          2.    <u>Plaintiff's Claims Do Not "Sound In" Violation of the
5                Investment Company Act</u>

6        Defendants claim that Plaintiff's claims are not actually for breach of
7  fiduciary duties, but for violations of Section 13(a) of the Investment Company Act,
8  which does not provide a private cause of action. Defs. Mot. at 20; *see also*
9  *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 615 F.3d 1106, 1108 (9th Cir. 2010)
10  ("*Northstar II*") ("[N]othing in § 13(a) as originally enacted or as subsequently
11  amended either creates a private cause of action[.]"). This argument wholly ignores
12  the Ninth Circuit's subsequent decision in *Northstar Financial Advisors, Inc.* which
13  reversed a district court's dismissal of fiduciary duty claims after holding that, as
14  discussed at length above, certain provisions in the ICA give rise to a contract
15  between a fund and its shareholders. 2015 U.S. App. LEXIS 7027, at *34. As
16  demonstrated herein, Defendants' fiduciary duties *stem from this contract, and their*
17  *role as Trustees and parties to the contract*.

18        The cases on which Defendants rely to claim that duties cannot arise from
19  the ICA (as opposed to the contract) are, therefore, a red herring, but in any event
20  they hold no such thing. In *O'Brien v. Pearson*, the Supreme Judicial Court of
21  Massachusetts merely agreed with the court below that, on the facts of that case, the
22  particular statutory violation did not constitute a breach of fiduciary duty. 868
23  N.E.2d 118, 125 n.7 (Mass. 2007). *O'Brien* concerned a privately held corporation
24  that sold assets without the necessary shareholder approval, and the court below
25  was "aware of no decision that equates automatically a violation of [the statute]
26  with a breach of fiduciary duty." *O'Brien v. Pearson*, 851 N.E.2d 1093, 1101 (Mass.
27  App. Ct. 2006). By contrast, there are many cases where conduct violating a statute
28  gave rise to a breach of fiduciary duty. *See, e.g., Berish*, 770 N.E.2d at 979 (poor

1   construction in violation of building codes was evidence of breach of fiduciary duty

2   to ensure that condominium units were properly constructed); *Demoulas v.*

3   *Demoulas*, 1993 Mass. Super. LEXIS 91, at *31 (Mass. Super. Ct. Oct. 4, 1993)

4   (violations of Exchange Act § 10b-5 gave rise to a cause of action based on breach

5   of fiduciary duty); *see generally In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d

6   959, 970 (Del. Ch. 1996) ("[A] director's obligation includes a duty to attempt in

7   good faith to assure that a corporate information and reporting system, which the

8   board concludes is adequate, exists, and that failure to do so under some

9   circumstances may, in theory at least, render a director liable for losses caused by

10  non-compliance with applicable legal standards.").

11       The District Court's finding that the plaintiffs in *Charles Schwab* had failed

12  "to explain how the alleged violation of the ICA would activate any non-ICA

13  fiduciary duties" is, now, dead-letter. 2009 U.S. Dist. LEXIS 44859, *20 (N.D. Cal.

14  May 15, 2009). In *Northstar Financial Advisors, Inc.*, the Ninth Circuit held that

15  the ICA gives rise to a contract. 2015 U.S. App. LEXIS 7027, at *34. Defendants'

16  fiduciary duties flow from that contract, not from the ICA.[7]

17       3.   The Exculpatory Provision Does Not Defeat Plaintiff's Claims

18       Massachusetts clearly disfavors exculpatory provisions in trusts that

19  "preclude[] a beneficiary from suing a trustee for a breach of trust[.]" *Demoulas v.*

20  *Demoulas Super Mkts.*, 677 N.E.2d 159, 171 (Mass. 1997) (citing *Marsman v.*

21  *Nasca*, 573 N.E.2d 1025, 1032 (Mass. App. Ct. 1991)). These provisions "will not

22  be enforced to relieve a trustee of liability for a breach of trust that is committed in

23  bad faith, intentionally, or with reckless indifference to the interests of the

24  beneficiary." *Id*. at 171-72 (citing *Dill v. Boston Safe Deposit & Trust Co.*, 175

---

25
26   [7] It is noteworthy that the District Courtourt in *Schwab* subsequently granted summary judgment to the plaintiffs in finding that the promoters violated the ICA
27   by exceeding a 25-percent limitation in respect of concentration of investments in a particular industry without first obtaining the approval of the fund's shareholders.
28   *In re Charles Schwab Corp. Secs. Litig.*, 2010 U.S. Dist. LEXIS 32113, at *21.

1  N.E.2d 911, 913 (Mass. 1961)).

2  Defendants point to an exculpatory provision in the Declaration of Trust, and

3  offer a conclusory statement that "[u]nder Massachusetts law, this exculpatory

4  provision is valid." Defs. Mot. at 19. This is plainly wrong, as Defendants cannot

5  reasonably dispute that the Trustees caused the Fund's assets to be invested in

6  emerging markets in excess of the 15% cap. By the same token, their reliance on

7  *Blake v. Smith* is misplaced. *See* 2006 Mass. Super. LEXIS 668, at *4 (Mass. Super.

8  Ct. 2006) (crediting a provision exculpating a breach of the duty of due care).

9  Plaintiffs have alleged not a lapse of the duty of care, but a negligent, bad faith,

10 willful, and/or reckless breach of the duty of trust and an affirmative and deliberate

11 violation of the covenant of good faith and fair dealing. ¶¶96, 101. Accordingly, the

12 provision is unenforceable. In any event, the effect of the exculpatory provision on

13 Defendants' liability in this case is a factual question that cannot be determined on

14 a motion to dismiss. *See Northstar VI*, 2015 U.S. Dist. LEXIS 135847, at *40-42.

15 **C.    SLUSA Does Not Apply to Plaintiff's Claims**

16 SLUSA precludes a claim when it derives from a class action of fifty or more

17 members "based upon the statutory or common law of any State" that alleges "a

18 misrepresentation or omission of a material fact in connection with the purchase or

19 sale of a covered security; or that the defendant used or employed any manipulative

20 or deceptive device or contrivance in connection with the purchase or sale of a

21 covered security." 15 U.S.C. § 78bb(f)(1). Here, SLUSA does not apply because (i)

22 Plaintiff does not assert misrepresentations or omissions; (ii) any

23 misrepresentations that did occur were not "in connection with" the purchase or sale

24 of securities; and (iii) the Delaware Carve-Out exception would preserve plaintiff's

25 claims even if SLUSA applied.

26 1.    Plaintiff Alleges Breach of Contract and Not Misrepresentation

27 Breach of contract claims are not precluded by SLUSA, even if they relate to

28 the purchase or sale of a covered security, when they do not rest on a

"misrepresentation or fraudulent omission." *In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128, 132, 142 (2d Cir. 2015). In determining whether a case rests on a misrepresentation, the court must "inquire whether the allegation is necessary to or extraneous to liability under the state law claims. If the allegation is extraneous to the complaint's theory of liability, it cannot be the basis for SLUSA preclusion." *Kingate*, 784 F.3d at 142-43.

*Freeman Investments, L.P. v. Pacific Life Insurance Co.* is instructive in the matter at hand. The Ninth Circuit noted that SLUSA "operates wherever deceptive statements or conduct form the gravamen or essence of the claim." 704 F.3d at 1115. In *Freeman*, the court held that SLUSA did not apply when the breach of contract claim centered on "the meaning of a key contract term" and a misrepresentation was not essential. ("Stripped to its essence", this was a contract claim.). *Id*. The court also observed that just because a party may have acted with a culpable state of mind, it does not mean there was a misrepresentation for SLUSA purposes. *Id*. at 1115-16 ("[D]efendants may not recast contract claims as fraud claims by arguing that they 'really' involve deception or misrepresentation.") (citing *Webster v. N.Y. Life Ins. and Annuity Corp.*, 386 F. Supp. 2d 438, 441 (S.D.N.Y. 2005)); *see also Walling v. Beverly Enters.*, 476 F.2d 393, 397 (9th Cir. 1973) ("Not every breach of a stock sale agreement adds up to a violation of the securities law.").

*Kingate Management* is also of special significance. The *Kingate* court held that "breach of contractual, fiduciary, or tort-based duties owed to Plaintiffs to provide competent management" among other things "would not require any showing of false conduct on the part of Defendants," and thus "such allegations are not precluded by SLUSA." *Kingate*, 784 F.3d at 132, 142.

Similar to *Freeman* and *Kingate*, the breach of contract claim here does not depend on false conduct and is not within the scope of SLUSA. Indeed, Plaintiff explicitly states in the Complaint that he is not alleging fraud or misrepresentation. ¶74. Moreover, considering the fact that Defendants accurately disclosed the 15%

restriction and the percentages of the Fund's emerging market investments, there can be no claim based upon a misrepresentation. Rather, Plaintiff alleges that a breach of contract occurred when Defendants exceeded the Fund's emerging market restriction and then modified it without first obtaining shareholder approval. This allegation does not involve a misrepresentation of any sort. *See Freeman*, 704 F.3d at 1115-16 (holding claim not precluded by SLUSA because the contract "involves a 'disputed truth' about the proper interpretation of the terms of a contract").

The recent *Northstar VI* decision from the Northern District of California does not change the outcome of this issue. In *Northstar VI*, the district court dismissed the plaintiff's third-party beneficiary and breach of contract claims on the basis of SLUSA. The district court's holding was premised on the finding that the wrongful conduct alleged constituted either a misrepresentation or omission because "[e]ither the [a]dvisor misrepresented what was going on . . . or the [a]dvisor declined to inform shareholders of the [a]dvisor's decision to abandon the [f]und's core investment objectives . . . ." Unlike the facts before the court in *Northstar VI*, Defendants here openly disclosed their investments in emerging markets. In its quarterly reports for the second and third quarter of 2014, the Fund indicated that emerging market investments surpassed the 15% restriction set forth in the prospectus. As opposed to *Northstar VI*, this is not a case where the defendant misrepresented what was going on or hid its decision to deviate from core investment strategies. Accordingly, Plaintiff's breach of contract claim does not involve the existence of a misrepresentation and, therefore, SLUSA cannot apply.[8]

---

[8] In deciding to apply SLUSA, the district court distinguished the facts in *Northstar VI* from those in *Freeman Investments, L.P. v. Pacific Life Insurance Co.* on the basis that *Northstar VI* did not involve an issue of contractual interpretation. *Northstar VI*, 2015 U.S. Dist. LEXIS 135847, at *54 n.7. This point of distinction does not exist in the matter at hand because an issue of contractual interpretation clearly exists. Defendants argue that, even if they were obligated to comply with the emerging markets restriction, they did not commit a breach because the Fund's emerging market investments never amounted to more than 15% of the

1    Plaintiff's claims sound in breach of contract, do not rely on the occurrence

2    of any misrepresentation, and therefore fall outside of SLUSA. *See Falkowski v.*

3    *Imation Corp.*, 309 F.3d 1123, 1131 (9th Cir. 2002); *Freeman*, 704 F.3d at 1115.

4         2.    Plaintiff's Claims Do Not Arise from a Purchase or Sale of a
             Security
5

6    Even if the court concludes that Plaintiff's claim rests on a misrepresentation,

7    SLUSA still does not apply because the claim was not "in connection with" the

8    purchase or sale of a covered security. Although courts have treated the "in

9    connection with" standard broadly, "it doesn't reach all transactions in which

10   securities play a role, however incidental." *Freeman*, 704 F.3d at 1116; *see Merrill*

11   *Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85-86 (2006); *SEC v.*

12   *Zandford*, 535 U.S. 813, 820 (2002). A misrepresentation occurs "in connection

13   with" the purchase or sale of a security when it "is material to a decision by one or

14   more individuals (other than the fraudster) to buy or to sell a 'covered security.'"

15   *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1079 (2014).

16   Here, the misrepresentation was not material to the buying or selling of a

17   covered security. Plaintiff does not allege that the misrepresentation *induced* anyone

18   to buy, sell or even hold shares of the Fund. What Plaintiff alleges is that Defendants

19   breached a contract with anyone who owned shares while Defendants exceeded the

20   emerging markets restriction. Defendants, by denying Plaintiff his contractual right

21   to vote, modified the contract terms without necessary prior approval from the

22   contractual parties. Thus, Defendants' breach did not occur "in connection with"

23   the purchase or sale of a security.

24        3.    In Any Event, Plaintiff's Claims Are Excluded from SLUSA
             Pursuant to the Delaware Carve-Out Exception
25

26   "[A] covered class action that is based upon the statutory or common law of

27   _____

28   Fund's *total* assets. Whether this is true, and how they calculated *total* versus
     *net* assets, is a critical issue in this lawsuit. *See* Point IV.A.2, *supra.*

the State in which the issuer is incorporated (in the case of a corporation) or organized (in the case of any other entity) may be maintained in a State or Federal court by a private party." 15 U.S.C. § 78bb(f)(3)(A). A covered class action is "any recommendation, position, or other communication with respect to the sale of securities of an issuer that is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer; and concerns decisions of such equity holders with respect to voting their securities, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights." *Id.*

Plaintiff's claims fall within the second prong of the carve-out. Plaintiff's claims are alleged under the law of Massachusetts, the state in which the trust was formed, and involve a "communication with respect to the sale of securities of an issuer that . . . concerns decisions of such equity holders with respect to voting their securities . . . ." *See* 15 U.S.C. § 78bb(f)(3)(A)(ii)(II). Courts have found the communication requirement easy enough to satisfy. *See Madden v. Cowen & Co.*, 576 F.3d 957, 972 (9th Cir. 2009) (press releases, information booklets, financial statements, and fairness opinions have all satisfied the communication requirement, regardless of whether the communication was addressed to the plaintiffs specifically); *see also Lazar v. Gregerson*, 2002 U.S. Dist. LEXIS 6152, at *11 (N.D. Cal. Apr. 5, 2002). Courts have also broadly construed the rest of the requirement that communications be "with respect to" equity holders' voting rights. *See City of Ann Arbor Emples. Ret. Sys. v. Gecht*, 2007 U.S. Dist. LEXIS 21928, at *9 (N.D. Cal. Mar. 9, 2007) (court equated "with respect to" to "in connection with," interpreted liberally in *Dabit*); *In re Metlife Demutualization Litig.*, 2006 U.S. Dist. LEXIS 60104, at *23 (E.D.N.Y. Aug. 7, 2006).

In this case, a communication clearly occurred in the form of the prospectus. *See Madden*, 576 F.3d at 972-73. The documents set forth a contract provision that could not be modified without prior voting approval of the shareholders. The carve-out need only "involve[]" communications "with respect to" voting, 15 U.S.C. §

77p(d)(1)(B), and does not explicitly require that a vote actually occur. *In re Metlife Demutualization Litig.*, 2006 U.S. Dist. LEXIS 60104, at *6. The claims here fall into this carve-out even if SLUSA applies. Defendants, by denying Fund investors their contractual right to vote, improperly acted as if the contract was modified. Had Defendants complied with the terms of the contract, Fund investors could have determined whether modifying the emerging markets restriction was in their best interest and thereby possibly avoided injury.

Defendants argue that *Crimi v. Barnholt* should be applied in this context. In *Crimi*, the court divided the plaintiffs' claims "into two groups: 'holder claims' and 'voter claims.'" *Crimi v. Barnholt*, 2008 U.S. Dist. LEXIS 108469, at *9 (N.D. Cal. Sept. 17, 2008). The holder claims arose from the failure "to disclose the options backdating in the proxy statements" and thus the plaintiffs were "deprived of their ability to make an informed decision concerning whether they should 'continue holding their shares.'" *Id*. The voting claims arose when "the non-disclosure in the proxy statements deprived [plaintiffs] of their ability to make an informed decision concerning whether . . . to adopt the . . . Plan." *Id*. Subsequently, the holder claims were dismissed while the voting claims were not. Here, Plaintiff does not claim that he was deprived of making a decision on whether to hold shares. Rather, Plaintiff alleges that he should have been able to vote to prevent the Fund from modifying terms of the Fund's prospectus. ¶¶69-75. Defendants denied Plaintiff "with respect to voting [his] securities" and therefore, Plaintiff claims are voting and not decision to hold claims. 15 U.S.C. § 77p(d)(1)(B).

## D.   Plaintiff Adequately Alleges Aiding and Abetting

Aiding and abetting liability exists where the defendant "knew of the breach and actively participated in it such that he or she could not reasonably be held to have acted in good faith." *Spinner v. Nutt*, 631 N.E.2d 542, 546 (Mass. 1994); *see also Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003) (applying state law to a claim for aiding and abetting breach of fiduciary

1    duty). Plaintiff adequately pleads breach of trust and breach of the covenant of good

2    faith and fair dealing by the Trustees. *See* Points IV.A & B, *supra*; *Reynolds v. City*

3    *Express, Inc.*, 2014 Mass. Super. LEXIS 44, at *27 (Mass. Super. Ct. Jan. 7, 2014).

4         Plaintiff's Complaint pleads facts showing that PIMCO caused the Trustees

5    to invest the Fund's assets in emerging markets in excess of the 15% emerging

6    market limitation. ¶¶47, 51, 68, 105-07. Plaintiff has also pleaded facts giving rise

7    to a reasonable inference that PIMCO knew of the breach. *See, e.g.*, ¶4 (noting

8    PIMCO was the investment advisor for the Fund), ¶7 (alleging PIMCO was

9    responsible for the disclosure of the emerging markets restriction), ¶66 (noting that

10    PIMCO was responsible for modifying language in the prospectus pertaining to the

11    emerging markets restriction). Accordingly, Plaintiff has adequately pleaded a

12    claim for aiding and abetting.

13    **V.**    <u>**CONCLUSION**</u>

14         Plaintiff requests that the Court deny the motion to dismiss in its entirety.[9]

15

16    Dated: October 12, 2015     Respectfully submitted,

17                           **WESTERMAN LAW CORP**

18

19                           <u>  /s/ Jeff S. Westerman             </u>

                              Jeff S. Westerman (SBN 94559)

20                           E-mail: jwesterman@jswlegal.com

21                           1900 Avenue of the Stars, 11th Floor

                              Los Angeles, California 90067

22                           Telephone: (310) 698-7880

23                           Facsimile: (310) 775-9777

24                                 -and-

25

---

[9] In the event that the Court finds Plaintiff's Complaint insufficient to defeat

26    Defendants' motion to dismiss, Plaintiff requests leave to amend. *See Lopez v.*

27    *Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) ("a district court should grant leave to

     amend even if no request to amend the pleading was made, unless it determines that

28    the pleading could not possibly be cured by the allegation of other facts").

1

**LEVI & KORSINSKY LLP**

2
Eduard Korsinsky

3
Christopher J. Kupka

30 Broad Street, 24th Floor

4
New York, New York 10004

5
Tel: (212) 363-7500

Fax: (212) 363-7171

6

7
-and-

8
Nicholas I. Porritt

9
Adam M. Apton

Adam C. McCall

10
1101 30th Street NW, Suite 115

11
Washington, DC 20007

Tel: (202) 524-4290

12
Fax: (202) 333-2121

13

*Attorneys for William T. Hampton*

14
*and Lead Counsel for Class*

15

16
4846-2472-1193, v. 5

17

18

19

20

21

22

23

24

25

26

27

28